FIFTH DIVISION
June 29, 2007

No. 1-03-0668

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| YOSHIAKI SHINOHARA, | ) | Honorable |
| | ) | John J. Scotillo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Following a jury trial, defendant Yoshiaki Shinohara was found guilty of five separate counts of child pornography. The trial court entered judgment on each of the five counts, but only sentenced defendant on count I, which was child pornography based upon possession of depiction by computer of any child engaged in any act of sexual intercourse (720 ILCS 5/11-20.1(a)(6) (West 2002) (referencing activity described in section 11-20.1(a)(1)(i) of the Criminal Code of 1961) (720 ILCS 5/11-20.1(a)(1)(i) (West 2002)), merging counts II through V into count I. The court sentenced defendant to three years of intensive probation and 250 hours of community service. Defendant appeals, contending the trial court (1) improperly denied his motion to quash arrest and suppress evidence; (2) abused its discretion in admitting certain testimony; (3) abused its discretion in permitting evidence of and prosecutorial comment on the child pornography relating to defendant's

underage girlfriend and allegations of sexual assault which she made against him; and (4) improperly defined "lewd" in jury instructions. Defendant also argues he was not proven guilty beyond a reasonable doubt.

## BACKGROUND

Defendant's conviction arose from a series of pornographic images of children found on his personal computer. The sequence of events that resulted in defendant's conviction began on August 24, 2001, when Schaumburg police officer Joe Dziedicz responded to defendant's residence. Prior to trial, defendant filed a motion to quash arrest and suppress evidence, contending that the police improperly seized his computer without a warrant, improperly delayed obtaining a warrant to search it, and failed to execute that search warrant within 96 hours in violation of the Illinois Code of Criminal Procedure of 1963. 725 ILCS 5/108-6 (West 2002). Defendant did not testify during the suppression hearing and the court denied the motion.

### I. Motion to Quash Arrest and Suppress Evidence

At the hearing on the motion to quash arrest and suppress evidence, Officer Dziedicz testified that shortly after 2 p.m., on August 24, 2001, he responded to defendant's call to have G.M., a 17-year-old female, removed from his apartment in Schaumburg, Illinois. Officer Dziedicz and his partner met defendant in the parking lot and accompanied him inside the apartment. Officer Dziedicz stated that the apartment was damaged and that it looked like the contents of every drawer and cabinet had been thrown on the floor. Ketchup and mustard had been squirted about the apartment, and the words "Rape" and "Rapist" were written on the living room wall with ketchup.

Shortly after the officers left defendant's apartment, they encountered G.M. She admitted she had damaged defendant's apartment and claimed defendant had previously had unwanted sexual relations with her. Officer Dziedicz stated he felt the situation presented a "can of worms" and asked both defendant and G.M. to come to the police station for further investigation. Defendant walked to the marked squad car driven by Officer Dziedicz, opened up the door, and got in the car. Defendant was not placed in handcuffs; the door, however, was locked.

Detective Ciccola testified that shortly after defendant and G.M. arrived at the station, Officer Dziedicz related the facts of the case to him and Detective Lebario. Detective Ciccola stated that the damage to defendant's apartment was part of the investigation. He explained, however, that the focus of the investigation at that time was criminal sexual assault, and that defendant had already informed the police he did not intend to sign a complaint for criminal damage to property.

Defendant and G.M. were placed in separate interview rooms. The police did not handcuff defendant; he was not, however, free to leave. Detective Ciccola and his partner interviewed G.M. first. She informed them that she was 17 years old and had met defendant outside a Japanese restaurant in July 2001. She explained at that time she did not have a place to stay, defendant took her in to live with him, and she began dating defendant. G.M. admitted she initially told defendant that she was 18 years old but stated she later informed him she was only 17 years old. G.M. stated she and defendant had sexual intercourse and oral sex 8 to 10 times, and that "it was always forced." According to G.M., defendant occasionally tied her up with a rope prior to the sex act. G.M. said defendant told her she would be hurt if she ever left the apartment. G.M. told the police that defendant took digital images and digital movies of her naked and engaging in sex acts while in the

3

1-03-0668

apartment.

After interviewing G.M., Detective Ciccola and his partner interviewed defendant. Defendant was given his <u>Miranda</u> rights and indicated he understood the rights and understood English. Defendant explained that he had a Japanese-English dictionary with him because he occasionally had a problem with a few words. Detective Ciccola testified defendant did not use the dictionary and conversed in English without any problems.

During the interview, defendant stated he met G.M. outside a Japanese restaurant and took her in because she was homeless. Defendant stated G.M. initially told him she was 18 years old. On one occasion while he was with G.M. in a forest preserve, G.M. told an officer who had approached them that she was 17. Defendant stated that she then changed her story and said she was 18. Although G.M. showed defendant identification at one point, he stated he did not get a good look at it. Defendant did not admit to Detective Ciccola during the interview that he knew G.M. was 17.

Defendant acknowledged he and G.M. had sexual intercourse and oral sex approximately 8 to 10 times. However, according to defendant, their sexual relations were consensual, and he never tied up G.M. Defendant also acknowledged he had digital images on his computer of G.M. naked as well as a digital movie of the two of them having sexual intercourse. Thereafter, Detective Ciccola and his partner asked defendant if he would voluntarily consent to have them look through his computer. Defendant said "Absolutely," and signed the consent to search form at 4:07 p.m., August 24, 2001.

After defendant signed the consent to search form, the detectives learned that G.M. had been

banging her head against the wall, lying on the floor, and acting unusual. Upon further investigation, the detectives learned that she was manic-depressive, a crack addict and threatening to commit suicide. G.M.'s mother was contacted, and it was agreed that G.M. should be committed. Before the ambulance arrived to pick her up, G.M. recanted her rape charges against defendant and stated that the sex had always been consensual. She reiterated, however, that defendant did take digital images of her in sex acts.

Detective Ciccola testified that with G.M. "going back and forth," he and his partner wanted to further investigate whether she had been tied up. While Detective Ciccola had suspicions about her story, he did not have any suspicions regarding her assertion that there were digital images on defendant's computer because defendant himself had confirmed this assertion. Detective Ciccola explained that at this point he was investigating child pornography because G.M. was under age 18.

The detectives drove defendant to his residence so he could show them the images of G.M. However, defendant could not access the images because G.M. had damaged the power cords. At the suggestion of one of the detectives, defendant agreed to take the computer to the police station to access the images. At the police station, he showed them images of defendant and G.M. having sexual relations and of her masturbating. While none of the images depicted G.M. tied up, Detective Ciccola knew that G.M. was only 17 years old and the images depicted her genitalia and her having sexual intercourse.

After the computer was shut down, defendant inquired what they were going to look for on his computer. Defendant explained that he was "embarrassed" about some of the images that were on the computer. Detective Ciccola asked defendant to which images he was referring. Defendant

responded that he had downloaded pornography off the Internet onto his computer and that some of the images were of "young people" or "younger people." When Detective Ciccola asked defendant if he knew the approximate ages of these people, defendant responded that he did not know their ages but knew they were young. Detective Ciccola asked defendant if he knew that possession of child pornography was illegal, and defendant responded affirmatively.

Detective Ciccola advised defendant that his computer would be inventoried and then sent for analysis to check it for child pornography. If the investigation did not reveal anything, the computer would probably be returned to defendant. The computer was inventoried at that time. Defendant, however, was not arrested at this point; the investigation was ongoing, and Detective Ciccola intended to wait for the results from the State Police crime lab and discuss the case with the State's Attorney's office.

Although defendant's computer was seized and inventoried on August 24, 2001, Detective Ciccola did not notify the Illinois State Police forensic crime unit of the facts of the investigation until October 29, 2001. On that date, Detective Ciccola contacted State Police Sergeant James Murray, head of the cyber crime unit. On November 7, 2001, the police obtained a search warrant for the computer, and on that same day Detective Ciccola delivered the computer to State Police Trooper Kaiton Bullock at the State Police crime lab. The search warrant had a return date of November 9, 2001, and specifically authorized the police to search defendant's "homemade mini tower computer" and seize "pictures of child pornography whether they are photographs and/or computer-generated images stored in the computer hard drive."

The parties stipulated that if called to testify, Trooper Bullock would state that he completed

6

his forensic examination of the images recovered from defendant's computer on January 10, 2002. Detective Ciccola viewed the subject images on January 24, 2002, and the assistant State's Attorney concluded on January 29, 2002, that some of the images depicted child pornography.

The trial court denied defendant's motion to quash arrest and suppress evidence. In support of its denial, the court found the detectives' detention of defendant was justified by reasonable suspicion, defendant's consent to search was voluntarily given, there was probable cause to seize the computer on August 24, 2001, the search warrant was timely executed, and the delay between the date the computer was seized and a search warrant obtained for it did not warrant suppression of the subject images.

## II. Trial

The testimony given at trial by Officer Dziedicz and Detective Ciccola was substantially similar to their testimony during the motion to suppress. Accordingly, we limit our description of their trial testimony to that not previously summarized in connection with the suppression motion. Officer Dziedicz testified at trial that although defendant believed at one point that G.M. was 18, he later learned that she was 17.

Detective Ciccola testified at trial that defendant admitted to him that he was the one who took the digital images of G.M. and himself involved in sex acts. In addition, defendant related to Detective Ciccola that he thought that G.M. was 18 years old and that she had told him she was 18 years old. Detective Ciccola further explained at trial that after defendant's computer was shut down and after defendant mentioned that he was "embarrassed" about some of the images on it, he asked defendant to what images he was referring. Defendant responded that he had downloaded

7

pornography off the Internet and that some of the images were of "younger people." Detective Ciccola acknowledged on cross-examination that defendant never specifically said that he had child pornography on his computer. Detective Ciccola indicated, however, that the fact that defendant had images of 17-year-old G.M. on his computer, together with the fact that he described the people in the images he was "embarrassed" about as "young," led Detective Ciccola to believe defendant had child pornography on his computer. When Detective Ciccola asked defendant if he knew the approximate ages of these people, Detective Ciccola indicated that defendant said "no, but they were young." Although defendant was charged with child pornography based upon many of the images ultimately recovered from his computer, he was not charged with child pornography based upon the images of G.M.

Illinois State Police Detective Kaiton Bullock, a computer forensic expert, testified at trial that he took custody of defendant's computer on November 7, 2001, and told Detective Ciccola he would contact him when he finished searching the computer. On November 8, 2001, he created a forensic image of the two hard drives located inside of defendant's computer. Bullock explained that a forensic image is essentially a bit-by-bit copy of the hard drive from the beginning to the very end. In order to create the forensic image, Bullock used software known as "EnCase." Bullock stated that in order to avoid disturbing the original evidence, he analyzed the contents of defendant's hard drives using the forensic image created by the EnCase software rather than using defendant's computer itself. Bullock explained that the EnCase software enabled him to access the hard drives through DOS (Disk Operating System 7.1) without booting them as though the computer were being turned on regularly. This form of access prevented any new rights or new information from being placed

on the hard drives and ensured that they were in the same condition they were in the last time the computer was turned on. After Bullock created the forensic image of the hard drives, he did not immediately examine and conduct a forensic analysis of the contents of those hard drives as he had a log of other cases that required his more immediate attention. Bullock subsequently searched the contents of defendant's hard drives and identified 105 images of suspected child pornography. At trial, Bullock identified and displayed 42 images (exhibits number 6 through 47) which he recovered during his forensic search.

Daniel Ferraro, an expert in forensic computer analysis, testified regarding factors that differentiate a virtual image from an actual image. Before direct examination, the State questioned Ferraro at a hearing outside the presence of the jury in order to qualify him as an expert in the field of forensic computer analysis. At that hearing, Ferraro testified regarding his training and experience that directly involved computer databases, computer software, police evidence, and pornography. At the time he testified, Ferraro had just begun working at Deloitte & Touche as a computer forensic analyst. Before beginning with Deloitte & Touche, Ferraro worked in the High-Tech Crime Bureau at the Illinois Attorney General's office, which was created in 1998 to specifically address child exploitation and child pornography on the Internet. Part of Ferraro's duties at the Bureau included developing and providing training. As lead computer evidence recovery technician with the Bureau, Ferraro conducted forensic analysis of images on recovered computers and did peer review of other examiners' forensic evaluations.

During his employment with the Bureau, Ferraro was also charged with creating a child pornography database of images of identified and known children. In creating this database, he

worked in conjunction with the United States Postal Service, United States Customs, the Federal Bureau of Investigation, and the National Center for Missing and Endangered Children. Before being hired by the Bureau, Ferraro was a police officer assigned to the Illinois Attorney General's Internet Child Exploitation Task Force; there he conducted on-line investigations. At the conclusion of the expert qualification hearing, the trial court ruled that Ferraro could testify as an expert in the field of computer forensics.

Ferraro testified before the jury that he relies on factors such as tone and texture of skin and hair on an image to determine whether it depicts a real child. Ferraro noted that some of the children found on defendant's computer were depicted in a series of multiple or separate images, and opined it is not possible to create the same virtual person in a series of images. In response to the question, "Is it is possible to create virtual people in series?" Ferraro responded:

"No. At this point, that is like the Holy Grail to the graphics community, who can create the most realistic human being. As I mentioned before, on the Web sites, there are the companies that are selling their products for rendering an eye. And sometimes these products, such as Render Man by Pixar, can cost ten to fifteen thousand dollars for a single license. If they had the ability to produce these images not nude, just clothed, I'm positive that these companies would be out there showing the images for everybody to look at and pushing their products that have created these images to sell to other people, including Hollywood movie producers."

10

Ferraro further testified that some of the images found on defendant's computer were from identifiable sources, such as a magazine from 1976, and that some images were in his department's database as previously published.

Defendant declined to testify and did not call any witnesses on his behalf. Following closing arguments, the jury returned verdicts of guilty on all five counts. The trial court sentenced defendant only on count I, the sexual intercourse charge, after merging counts II through V into count I. Defendant's motion for new trial was denied.

ANALYSIS

I. Defendant's Motion to Quash Arrest and Suppress Evidence

Defendant challenges the trial court's denial of his motion to quash and suppress evidence. The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution guarantee freedom from unreasonable searches and seizures by the government. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6; People v. Flowers, 179 Ill. 2d 257, 262 (1997).

When reviewing a ruling on a motion to quash arrest and suppress evidence, we give deference to the trial court's factual findings and credibility determinations and reverse those conclusions only if they are against the manifest weight of the evidence. People v. Gherna, 203 Ill. 2d 165, 175 (2003). After reviewing the trial court's factual findings, we review de novo the trial court's ultimate legal ruling as to whether suppression is warranted. People v. Pitman, 211 Ill. 2d 502, 512 (2004). A reviewing court is not limited to the evidence presented during the trial court's suppression hearing, but may also consider evidence that was presented during the defendant's trial. People v. Sims, 167 Ill. 2d 483, 500 (1995).

11

## A. Scope and Duration of Detention

Defendant does not dispute that the police had reasonable suspicion to detain him and take him to the police station in order to verify or dispel G.M.'s rape allegation against him. Rather, defendant argues that "[o]nce the officers concluded (or should have concluded) the rape charges had no merit (based on G.M.'s behavior and own admission to destroying defendants's apartment and lying about the rape charges), the detectives impermissibly expanded the scope of the Terry stop by searching his apartment to look for videos of G.M. being tied up." Under Terry v. Ohio, 392 U.S. 1, 20, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1880 (1968), a police officer may "conduct a brief, investigative stop of individuals, absent probable cause to arrest, provided the officer has a reasonable, articulable suspicion of criminal activity." People v. Gonzalez, 204 Ill. 2d 220, 227 (2003).

We reject defendant's contention that G.M.'s statements and behavior at the police station completely dissipated the officers' reasonable articulable suspicion of criminal activity. G.M.'s recantation and erratic conduct did not negate the fact that she had previously written the words "rape" and "rapist" on the walls of that apartment and related instances where defendant had tied her up and forced her to have sex. Moreover, G.M., a 17-year-old girl, reiterated to the detectives at the time of her recantation that defendant had taken digital images of her naked and engaging in sex acts.

These articulable facts justified the officers' detention of defendant and decision to investigate further as these facts indicated that defendant may not only have raped G.M., but may also have committed the offense of child pornography under section 11-20.1(a)(6) of the Criminal

1-03-0668

Code.

Section 11-20.1(a)(6) of the Criminal Code provides that a person commits that offense if he "with knowledge of the nature or content thereof, possesses any film, videotape, photograph or other similar visual reproduction or depiction by computer of any child *** whom the person knows or reasonably should know to be under the age of 18 *** engaged in any activity described in subparagraphs (i) through (vii) of paragraph 1 of this subsection." 720 ILCS 5/11-20.1(a)(6) (West 2002). The activity listed in section 11-20.1(a)(1)(i) of the Criminal Code is described as "actually or by simulation engaged in any act of sexual penetration or sexual conduct with any person or animal." 720 ILCS 5/11-20.1(a)(1)(i) (West 2002). We note that before the police returned to defendant's apartment, defendant admitted that he had digital images and movies on his computer of G.M. naked and of the two of them having sexual intercourse. Defendant's admission confirmed the information provided by G.M. and thus provided the officers with additional articulable facts providing a reasonable basis for believing that defendant had committed the offense of child pornography under section 11-20.1(a)(6) of the Criminal Code (720 ILCS 5/11-20.1(a)(6) (West 2002)) (referencing activity described in section 11-20.1(a)(1)(i) of the Criminal Code) (hereinafter cited as 720 ILCS 5/11-20.1(a)(6) (West 2002)). In short, defendant's confirmation that he had images of G.M. on his computer naked and engaging in sex provided the officers with " 'an independent basis for reasonable articulable suspicion' " justifying the officers' continued detention of defendant. Gonzalez, 204 Ill. 2d at 235, quoting United States v. Holt, 264 F.3d 1215, 1240 (10th Cir. 2001) (Murphy, J., concurring in part and dissenting in part).

13

We further note that responses to a police officer's inquiries "may arouse further suspicion or dispel the questions in the officer's mind." People v. Smith, 208 Ill. App. 3d 44, 50 (1991). If the responses dispel police suspicion, the individual should not be detained any longer. Smith, 208 Ill. App. 3d at 50. If the responses arouse further suspicion, an officer may prolong the stop and expand the scope of his inquiry. Smith, 208 Ill. App. 3d at 50; see also People v. Sloup, 359 Ill. App. 3d 841, 847 (2005). For the reasons previously discussed, the officers were justified in continuing to detain defendant and investigate further based on not only the information provided by G.M., but also on the admissions made by defendant.

## B. Consent

Defendant further contends the State failed to "meet its burden to prove, by a preponderance of the evidence, that the search of defendant's home and the seizure of his personal computer was the product of knowing, voluntary consent."

"[A] search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment." People v. Anthony, 198 Ill. 2d 194, 202 (2001). "The validity of a consent [to] search depends on the voluntariness of the consent." Anthony, 198 Ill. 2d at 202. "The voluntariness of the consent in question is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary." Anthony, 198 Ill. 2d at 202. "The reviewing court will not reverse the trial court's determination of the voluntariness of a consent unless it is clearly unreasonable." People v. Leon, 311 Ill. App. 3d 624, 633 (2000).

In the instant case, defendant initiated the original meeting with the police and admits that

he voluntarily accompanied the police officers to the police station. Both G.M. and defendant told detectives about the digital images of G.M. on defendant's computer. Defendant acknowledged he had digital images on his computer of G.M. naked as well as a digital movie of the two of them having sexual intercourse.

Based upon this information, detectives asked defendant if he would voluntarily consent to have them look at the images on his computer. Defendant said "Absolutely," and signed a consent to search form which gave permission to the police to remove "any articles, evidence, materials, or any other property which these officers deem necessary." The written consent given by defendant to search his apartment and take his computer further provided that the "written permission to search and seize is being given voluntarily without threats or promises of any kind." After discovering that G.M. damaged the power cords and the computer could not be accessed at the apartment, the police suggested taking the computer to the police station to view the images. Defendant agreed, carried the computer to the squad car, and followed the police to the station.

Defendant argues that his consent was not voluntary but, rather, was "mere acquiescence to authority" because "he was a Japanese citizen who even had a Japanese-English dictionary with him at the time of interrogation." Defendant wants us to conclude that he lacked the ability to speak and understand English and was therefore incapable of giving voluntary consent. The record rebuts this argument. Detective Ciccola testified that defendant was able to speak and understand English during his interview with him. The trial court specifically addressed and rejected defendant's contention that his possession of a Japanese-English dictionary demonstrated defendant's consent was not voluntary.

In further support of his argument that his consent was not voluntary, defendant relies on the fact that he was not free to leave at the time he signed the consent form. We note that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." United States v. Watson, 423 U.S. 411, 424, 46 L. Ed. 2d 598, 609, 96 S. Ct. 820, 828 (1976). The fourth amendment does not require that a lawfully seized defendant be advised that he is "free to go" before his consent may be recognized as voluntary. See Ohio v. Robinette, 519 U.S. 33, 35, 136 L. Ed. 2d 347, 352, 117 S. Ct. 417, 419 (1996).

Defendant also contends that the consent obtained by the officers was "tainted." Defendant argues that "when the officers entered the apartment, they were relying on tainted consent because the defendant's consent to search his computer was based on the premise that such consent was to be used to discover evidence relating to the rape allegation. Once that allegation proved false (i.e., before the search began), law enforcement officers could not use this consent as a ticket into his home to search for evidence of other crimes."

We find defendant's "tainted" consent argument unpersuasive. Contrary to defendant's contention, the record does not reveal that G.M.'s rape allegation had been proven false at the time the officers conducted their search. As previously noted, the fact that G.M. had ransacked defendant's apartment, written the words "rape" and "rapist" on the apartment's walls, and mentioned instances where defendant had tied her up and forced her to have sex provided the police with reasonable suspicion that G.M. may indeed have been raped by defendant. G.M.'s recantation and erratic behavior were not adequate to dispel that suspicion.

Moreover, while conducting the investigation of G.M.'s rape allegation, the police were not

16

required to disregard evidence of other criminal activity. United States v. Lemmons, 282 F.3d 920, 925 (7th Cir. 2002) ("A policeman need not avert his eyes to what a suspect voluntarily puts before them"). The very images of G.M. which defendant believed established he did not rape her, did in fact depict G.M., who was under the age of 18, engaged in sexual conduct with defendant. One digital image depicted G.M.'s genitalia while she was masturbating, and another digital image depicted defendant and G.M. having sexual intercourse. Those images provided police with evidence of child pornography, and the police certainly were not required to disregard this evidence of other criminal activity by defendant.

### C. Probable Cause to Seize

Defendant next contends that the police did not have probable cause to seize the computer. Defendant argues that "even if this consent was valid, once the officers determined the photographs did not depict a rape[,] defendant's consent no longer continued and cannot be used to justify the seizure of his computer."

"In the absence of consent or a warrant, a police officer must have probable cause to effect a seizure." People v. Blair, 321 Ill. App. 3d 373, 377 (2001). "A police officer has probable cause to seize an item where the facts available to the officer would justify a man of reasonable caution in the belief that the item may be contraband, stolen property, or evidence of a crime." Blair, 321 Ill. App. 3d at 377.

The detectives in the instant case did have probable cause to seize defendant's computer because they personally viewed images on it which indicated that defendant committed the crime of child pornography. Defendant confirmed that he had digital images on his computer of G.M.

naked and of the two of them having sexual intercourse. Shortly before seizing the computer, the officers viewed images of G.M., who was under age 18, engaged in sexual conduct. The officers had a reasonable basis for believing that defendant knew G.M. was under age 18. During questioning, G.M. stated that although she initially told defendant she was 18 years old, she later informed him that she was 17 years old. When asked about his relationship with G.M., defendant stated that although he had believed that G.M. was 18 years old, he later discovered that she was 17 years old.

Defendant further contends that "the fact that [he] told the detective he was embarrassed because there may be images of 'young people' on his computer did not give the [police] probable cause to seize the computer on the basis that it may contain evidence of child pornography." Defendant mistakenly assumes that his statement that he downloaded pornography with some images of "young people" provided the only basis for the seizure of his computer. Probable cause to believe that the computer was evidence of a crime, however, existed before defendant made the statement about images of "young people" on his computer. G.M.'s statement to the police that defendant took digital images of her naked and engaging in sex acts with him prompted the police to seek consent from defendant to examine his computer. Defendant provided probable cause to seize his computer when he voluntarily showed the officers images on his computer of G.M. naked and engaging in sex with him. Defendant's subsequent statement at the police station about images of young people on his computer escalated the already existent probable cause and further supported the seizure of his computer by the police.

## D. Search Warrant

Defendant next contends that even if there had been probable cause to seize his computer,

"[his] right to be free from unreasonable searches and seizures was still violated because the police did not obtain a search warrant in a reasonably diligent manner." Defendant notes that "Ciccola first seized [his] computer on August 24, 2001, but he did not obtain a search warrant until November 7, 2001 (75 days later)." Defendant additionally notes that although the trial court found there was delay, it ultimately denied his motion to suppress. Defendant argues that this ruling was incorrect because "search and seizure principles mandate such suppression as the proper remedy." We disagree.

We first address defendant's argument that Detective Ciccola's delay in obtaining the search warrant rendered the seizure of his computer unreasonable. Defendant does not cite any legal authority which provides that delay in obtaining a warrant, in and of itself, transforms an initially lawful seizure supported by probable cause into an unlawful seizure requiring suppression of the item seized. Indeed, a review of a Seventh Circuit opinion which construes the meaning of seizure under the fourth amendment supports the conclusion that Detective Ciccola's delay in obtaining a search warrant did not render the seizure of defendant's computer unreasonable. See Lee v. City of Chicago, 330 F.3d 456 (7th Cir. 2003).

In Lee, the plaintiff was hit by stray gunfire while driving his car down a Chicago street. Lee, 330 F.3d at 458. The police promptly impounded the plaintiff's car so that they could later search for, retrieve, and examine any bullets that might have been imbedded in it. Lee, 330 F.3d at 458-59. Ten days later, the City of Chicago (City) notified the plaintiff that it no longer needed his car for evidentiary purposes. Lee, 330 F.3d at 459. However, in a notice sent to the plaintiff two days after his car was impounded, the City informed the plaintiff that before he could retrieve his car, he had

to either pay towing and storage fees or request a hearing. Lee, 330 F.3d at 459.

The plaintiff was unable to pay the amount demanded by the City and hired a lawyer who negotiated an acceptable payment amount. Lee, 330 F.3d at 459. Thereafter, the plaintiff filed a complaint against the City pursuant to 42 U.S.C. §1983 (2000) alleging, inter alia, that the City had violated his rights under the fourth amendment to be free from unreasonable searches and seizures. Lee, 330 F.3d at 459. The district court dismissed the complaint, and the plaintiff appealed that dismissal to the Seventh Circuit Court of Appeals. Lee, 330 F.3d at 459.

On appeal, the plaintiff did not dispute that the initial impoundment of his car for evidentiary purposes constituted a reasonable seizure. Lee, 330 F.3d at 460. Rather, he argued that the City's continued possession of his car became a meaningful interference with his possessory interest, thereby constituting a fourth amendment seizure. Lee, 330 F.3d at 459. The reviewing court rejected the plaintiff's argument, concluding that the City's retention of his car did not amount to an unreasonable seizure under the fourth amendment. Lee, 330 F.3d at 466.

In addressing the plaintiff's argument, the court first noted that the United States Supreme Court in Soldal v. Cook County has defined the term "seizure" as " 'some meaningful interference with an individual's possessory interests in [his] property.' " Lee, 330 F.3d at 460, quoting Soldal v. Cook County, Illinois, 506 U.S. 56, 61, 121 L. Ed. 2d 450, 458, 113 S. Ct. 538, 543 (1992). The court subsequently noted that "[f]rom the time of the founding to the present, the word seizure has meant a 'taking possession' " (Lee, 330 F.3d at 462-63, quoting California v. Hodari D., 499 U.S. 621, 624, 113 L. Ed. 2d 690, 696, 111 S. Ct. 1547, 1549 (1991)), that at the time the fourth amendment was drafted, the word "seizure" was defined as a temporally limited act (Lee, 330 F.3d

20

at 462), and that " '[a] seizure is a single act, and not a continuous fact' " (Lee, 330 F.3d at 463, quoting Thompson v. Whitman, 85 U.S. (18 Wall.) 457, 471, 21 L. Ed. 897, 902 (1873)). Based upon these definitions of "seizure," the Seventh Circuit in Lee reasoned:

> "Soldal's 'meaningful interference with a possessory interest' definition is limited to an individual's interest in *retaining* his property. Once *** the seizure of the property is complete, and once justified by probable cause, that seizure is reasonable. The [fourth] amendment then cannot be invoked by the dispossessed to regain property." (Emphasis in original.) Lee, 330 F.3d at 466.

In addition, the court reasoned that an individual's interest in regaining property which was initially seized with probable cause "is not, and never has been, a concern of the [f]ourth [a]mendment." Lee, 330 F.3d at 465. Applying the above definitions and reasoning to the case before it, the Seventh Circuit concluded that the plaintiff's car was seized at the time it was impounded and that "[c]onditioning the car's release upon payment of towing and storage fees after the search was completed neither continued the initial seizure nor began another." Lee, F.3d at 466.

In the instant case, as previously discussed, the detectives did have probable cause to seize defendant's computer at the time they took possession of it and inventoried it on August 24, 2001, because they had personally viewed images on it which reasonably justified their belief that defendant committed the crime of child pornography. We recognize that the police did not obtain a warrant to search the computer until November 7, 2001; however, this delay did not operate to transform the initially reasonable seizure of defendant's computer into an unreasonable seizure under

21

the fourth amendment.

In addition to arguing that the delay in obtaining the search warrant violated his right under the fourth amendment to be free from unreasonable seizure, defendant also suggests, without any elaboration or citation to authority, the delay violated his right to be free from unreasonable search. We recognize, as the State observes in its response brief, that delay in obtaining a search warrant could render a search unreasonable when the facts supporting the underlying probable cause may have grown stale or the item or place to be searched is subject to change. See People v. Thompkins, 121 Ill. 2d 401, 434-36 (1988) (unchanged facts together with nature of property did not dissipate probable cause justifying evidence seized pursuant to a search warrant executed 83 days after murder).

In the instant case, however, defendant has not argued that the condition or contents of his computer changed between the time the computer was seized and the search warrant was obtained. Morever, the record reflects no such change. Accordingly, for the reasons previously discussed, we conclude that the passage of approximately 75 days between the seizure by the police of defendant's computer and the issuance of a warrant authorizing the police to search that computer did not violate defendant's right under the fourth amendment to be free from unreasonable search and seizure and thus did not require suppression of the images recovered from that computer.

Defendant next contends that the investigating officers delayed in executing the search warrant and that this delay required suppression of the images upon which his conviction was based.

The search warrant was issued on November 7, 2001, and states in relevant part:

"On this day 07 Nov. 2001, Det. Gary Ciccola, Schaumburg

22

Police, Complainant has subscribed and sworn to a complaint for search warrant before me. Upon examination of the complaint, I find that it states facts sufficient to show probable cause.

I therefore command that you search, a homemade mini tower computer, currently in the possession of the Schaumburg Police Department, located at 1000 W. Schaumburg Rd., Schaumburg, Illinois, which is white in color, and seize the following instruments, articles and things which have been used in the commission of or which constitutes evidence of the offense of Child Pornography, Chapter 720 ILCS 5/11-20.1(a)(1)

TO WIT: Pictures of child pornography whether they are photographs, and or computer generated images, stored on the computer hard drives used by [defendant], and any and all information and data stored in the form of magnetic or electronic coding on computer media, or on media capable of being read by a computer or with the aid of computer related equipment ***."

On the same day the above warrant was issued (November 7, 2001), Detective Ciccola served a copy of it on defendant and took the computer from the evidence vault of the Schaumburg police department and turned it over to Kaiton Bullock of the Illinois State Police crime lab. Bullock created a mirror image copy of its hard drives the next day (November 8, 2001), and the search warrant, in turn, was returned to the court the following day (November 9, 2001). Bullock

conducted his forensic analysis on the mirror images of the hard drives, rather than on the hard drives themselves. He completed his forensic analysis of the hard drives on January 10, 2002, and on January 24, 2002, Detective Ciccola and his partner retrieved defendant's computer and returned it to the evidence vault of the Schaumburg police department.

Defendant contends that once the investigating officers obtained the above warrant, they did not execute it within the 96-hour time frame mandated by the Illinois Code of Criminal Procedure and that the subject images must therefore be suppressed. In support of that contention, defendant argues that "Illinois has a long history of suppressing evidence where officers have delayed in seizing evidence pursuant to a valid warrant."

Section 108-6 of the Code of Criminal Procedure provides as follows:

"The warrant shall be executed within 96 hours from the time of issuance. If the warrant is executed the duplicate copy shall be left with any person from whom any instruments, articles or things are seized or if no person is available the copy shall be left at the place from which the instruments, articles or things were seized. Any warrant not executed within such time shall be void and shall be returned to the court of the judge issuing the same as 'not executed.' " 725 ILCS 5/108-6 (West 2002).

Relying upon People v. Van Note, 63 Ill. App. 3d 53, 55 (1978), and People v. Wiedeman, 324 Ill. 66, 69 (1926), defendant argues that "[t]he purpose of the 96-hour rule is to prevent interference with defendant's property rights." We find defendant's reliance on these cases

24

misplaced. Wiedeman predates the enactment of the 96-hour provision and thus does not provide a basis for determining the purpose underlying that provision. The court in Van Note reviewed whether the trial court properly found that a less than 96-hour delay in completing a search was unreasonable under the fourth amendment. See Van Note, 63 Ill. App. 3d at 55-56. While the court in Van Note did mention the 96-hour statutory limitation on the execution of warrants included in section 108-6 of the Code of Criminal Procedure (now see 725 ILCS 5/108-6 (West 2002)), it did not construe the word "execute" or discuss the purpose underlying the statute. Van Note, 63 Ill. App. 3d at 55.

Defendant notes that no Illinois court has interpreted the term execute used in the above provision. He contends, however, relying upon Merriam Webster's Collegiate Dictionary (10th ed. 1993), that under its plain and ordinary meaning, "execute" means "to carry out fully: put completely into effect." Based upon this definition, defendant argues that the investigating officers waited 78 days to execute the warrant after its issuance on November 7, 2001. Specifically, defendant argues that the warrant was not executed until January 24, 2002.

The State responds that a more reasonable interpretation of the term "execute" is "to commence." Here, the State notes, Detective Ciccola took the computer from the evidence vault and delivered it to the crime lab on November 7, 2001. The search, the State argues, was officially "commenced" with this act. The State alternatively argues that the search was actually completed when Bullock created the mirror image copy of the hard drives on November 9, 2001, which was within 96 hours of the warrant's issuance. The State further notes that Bullock's forensic analysis, from that point forward, was done on that copy and not on the computer's hard drives themselves.

1-03-0668

We reject defendant's assertion that the warrant in the instant case was not executed until January 24, 2002, the day on which Detective Ciccola and his partner retrieved defendant's computer from the forensic lab and returned it to the evidence vault of the Schaumburg police department. The search warrant in the instant case directed the investigating officers to "search[] a homemade mini tower computer" and seize instruments, articles, and things "which have been used in the commission of or which constitutes evidence of [c]hild [p]ornography." The warrant was issued on November 7, 2001, and, in the factual context of this case, Bullock executed the warrant by completely carrying out the directions included in the warrant on November 8, 2001, when he made a mirror image copy of defendant's hard drives using the EnCase software. Bullock's subsequent examination of the contents of the hard drives was forensic analysis.

Moreover, even if we accepted defendant's argument that the search warrant was not executed until January 24, 2002, we find no violation of the purpose underlying the 96 hour rule. We emphasize that the purpose of statutes invalidating search warrants for delay in execution is to insure that the items sought by the warrant are in the place to be searched, that probable cause supporting the search warrant has not grown stale and that the integrity of the evidence has not been compromised. 68 Am. Jur. 2d *Searches and Seizures* § 292 (2000); O. Kerr, Search Warrants in An Era of Digital Evidence, 75 Miss. L. J. 85, 102 (2005). In the instant case, the record does not reflect that there was any less probable cause to believe there were images of child pornography on defendant's computer on the day the warrant was issued than on the day Bullock completed his forensic analysis of the mirror images of the hard drives. Defendant does not challenge the integrity of the evidence of child pornography by arguing the evidence was tampered with or altered. While

26

we recognize it is desirable for electronic searches to occur in a timely manner, staleness ceases to be a concern after the evidence has been lawfully seized. 75 Miss. L. J. at 103.

We note that a careful reading of the plain language of section 108-6 reflects that while its 96-hour rule is intended to apply to the execution of search warrants, it is not generally intended to apply to the execution of search warrants authorizing the search of evidence lawfully seized and lawfully in the possession of the investigating authorities prior to the issuance of the search warrant to be executed. This case presents the unique situation in which the police sought a search warrant for evidence already lawfully seized and lawfully in their possession.

The second sentence of section 108-6 reflects the type of warrants to which the 96-hour rule was intended to apply:

> "If the warrant is executed the duplicate copy shall be left with any
> person from whom any instruments, articles or things *are seized* or if
> no person is available the copy *shall be left at the place from which*
> *the instruments, articles or things were seized*." (Emphasis added.)
> 725 ILCS 5/108-6 (West 2002).

This sentence requires law enforcement officers executing a warrant to either (1) leave a duplicate copy of the search warrant with the person from whom the items in question "are seized" or (2) leave a duplicate copy of the search warrant at the place from which the items were seized. These two alternative requirements reflect that the 96-hour rule included in section 108-6 is generally intended to apply to the execution of warrants authorizing the search of items not already in the lawful possession of the investigating authorities. The first clause of this sentence requires the investigating

27

officer to leave the warrant with the person from whom the items "are seized." The clause does not require officers to leave a warrant with the person from whom the items "have already been lawfully seized." Indeed, the clause's use of the present tense "are seized" presumes that the investigating officers will not have previously seized the subject items but, rather, that the warrant will provide the basis for seizing the subject items and that the seizure of those items will coincide temporally with the leaving of a duplicate copy of the warrant.

The second clause included in the above-quoted sentence requires the investigating officer to physically leave a copy of the search warrant at the place from which the items are seized in the event no person is available at that place at the time of the seizure. This clause is clearly intended to notify the person having an interest in the subject items of the fact that they have been seized and that the search warrant provided the basis for their seizure. The clause thus presumes that the seizure will have occurred without the knowledge of the interested party and at a location other than a police station or police crime laboratory.

Accepting defendant's argument that the search warrant was not executed until January 24, 2002, we find, applying the plain language of section 108-6, that the investigating officers in the instant case were not required by its provisions to execute the subject search warrant within 96 hours. Here the investigating officers lawfully seized defendant's computer with probable cause based upon the previously described images which defendant voluntarily showed them and without the need of a search warrant. At the time his computer was seized, defendant was informed that it would be sent to a laboratory for forensic analysis. Thereafter and prior to that forensic analysis, the officers obtained a search warrant authorizing the search of the computer which had already been lawfully

28

seized by the police. Because the lawful seizure of the computer predated the issuance of the warrant, the officers were not in a position to leave a copy of that warrant with defendant at the time of the seizure as contemplated by the "are seized" language of the second clause of the first sentence of section 108-6. Furthermore, as a result of the lawful seizure of the computer based on probable cause, the computer was already in the possession of the police and the officers were not in a position to leave a copy of the warrant in the place from which the computer was taken. We note that while under the circumstances of the instant case it was not required by section 108-6, a copy of the search warrant was nonetheless given to defendant at his office prior to the execution of the of the warrant. The investigating officers at the time the search warrant was issued were already lawfully in possession of the computer, which was the item to be searched as specified in the search warrant.        As a final matter, we emphasize that section 108-6 was enacted in 1963, well before the computer age and before recognition by courts all over the country that the search of computer data involves more preparation than an ordinary search and a greater degree of care in the execution of the warrant. See Commonwealth v. Ellis, Nos. 97-192, 97-562, 98-355, 97-193, 97-561, 97-356, 97-563 (August 27, 1999) (noting that state statute requiring searches be completed within seven days predated advent of computer age and did not apply to computer searches since "search of computer data involves more preparation than an ordinary search and a greater degree of care in the execution of the warrant"). Indeed, "the forensic process typically takes a number of days once started, and the backlog of cases in most jurisdictions means that weeks or months may pass before the analysis even begins." O. Kerr, Search Warrants in An Era of Digital Evidence, 75 Miss. L.J. 85, 103 (2005). In the instant case, Officer Bullock, who performed the forensic analysis, testified

that there was a  backlog in his laboratory.  Similar to the court in <u>Ellis</u>, we believe that our state legislature did not draft section 108-6 with computer searches in mind and would not have intended for the 96-hour rule included in that section to be mechanically applied to all computer searches. Indeed we note that the Committee Comments following the statute, which were revised in 1970, state: "The ninety-six hour time limit established by this paragraph is an *arbitrary* figure with an eye to giving the officer some leeway as a practical matter, and at the same time denying him unbridled discretion."  (Emphasis added.)  725 ILCS Ann. 5/108-6, Committee Comments - 1963, at 260 (Smith-Hurd 1992).  For the reasons previously discussed, even if we accepted defendant's argument that the search warrant was not executed until January 24, 2002, in the factual context of this case the officers were not required to execute the warrant within 96 hours of its issuance.

Defendant next argues that even if the amount of time which transpired between the issuance and execution of the warrant did not violate the 96-hour provision of section 108-6, it violated his right to be free from an unreasonable search under the fourth amendment and article I, section 6, of the Illinois Constitution.

A delay in the execution of a search warrant does not violate a defendant's right to be free from an unreasonable search absent a showing of the interim dissipation of probable cause or any prejudice to the defendant.  See <u>People v. Ripa</u>, 80 Ill. App. 3d 674, 679 (1980) (two-day delay in execution of warrant "with no showing of the interim dissipation of probable cause or any prejudice to the defendant[] could comprise no constitutional violation"); 2 W. LaFave, Search & Seizure, §4.7(a), at 645-46 (4th ed. 2004) (noting that delay in execution of search warrant does not violate the fourth amendment if probable cause justifying the search has not dissipated during the delay);

1-03-0668

Commonwealth v. Ellis, Nos. 97-192, 97-562, 98-355, 97-193, 97-561, 97-356, 97-563 (August 27, 1999) (noting that prejudice occurs "when evidence is found on the premises which would not have been present had a prompt search taken place").

In the instant case, defendant has not offered any evidence showing a dissipation of probable cause between the time his computer was seized and the search warrant was subsequently executed. Indeed, the computer remained in the custody of the State during that time and defendant does not challenge the chain of custody. However, defendant does contend that he was prejudiced by the delay in executing the search warrant. In support of this contention, defendant asserts as follow:

> "Here, the officers decided not to prosecute the defendant based on his possession of the images of G.M. (ostensibly because she admitted she lied to him about her age, he believed she was 18 years old, and she would obviously make an incredible witness). They only had a vague statement that he had images of 'young people' on his computer. The officers should have either confirmed or denied the existence of child pornography on the computer, and if there was none, the computer could be returned to the defendant."

The above assertions by defendant do not indicate that the images giving rise to his conviction would not have been recovered had the warrant been executed more promptly. Furthermore, defendant does not demonstrate any other prejudice. Accordingly, based upon the foregoing discussion, we conclude that the passage of time between the issuance and execution of the search warrant in the

31

instant case does not require suppression of the images in question.

## II. Evidentiary Rulings

### A. Daniel Ferraro

The prosecution offered Daniel Ferraro as an expert in the field of forensic computer analysis in order to assist the jury in determining whether the images found on defendant's computer depicted actual or real children or were simply virtual images. Before trial, the State gave the defense a five-page report which Ferraro prepared after reviewing images found on defendant's computer. The report identified three images which, according to the United States Customs Cybersmuggling Center, were of "known children." The report identified five images as "previously published" images and identified the two source magazines for these images.

Following questioning of Ferraro regarding his expert qualifications, defense counsel inquired of the trial court as to what it was going to allow Ferraro to testify. The trial court responded Ferraro would be allowed to testify about traits one can look at to determine if a picture is genuine or computer-generated. Defense counsel objected to the admissibility of Ferraro's testimony on the basis that he had not received sufficient notice regarding the nature of that testimony and that it would thus constitute a discovery violation. Defendant contends on appeal that the trial court erred in allowing Ferraro to testify and asserts that he "rightly believed Ferraro's testimony would be barred." Defendant maintains that "[h]ad [he] known Ferraro would have offered the highly technical and speculative opinions with regard to the state of technology in the graphic[] arts community, he could have called his own expert to rebut such testimony." Defendant argues that Ferraro's testimony constituted a serious discovery violation and relies upon People v.

<u>Hood</u>, 343 Ill. App. 3d 1245 (2003), contending that it "is exactly on point with the case at bar."

In <u>Hood</u>, the appellate court ruled that the defendant was prejudiced by the State's failure to disclose its rebuttal witness as an expert in reverse extrapolation of alcohol. <u>Hood</u>, 343 Ill. App. 3d at 1252-55. In support of its ruling, the appellate court noted that Supreme Court Rule 412(a)(iv) requires the State to disclose an expert's statements regarding " 'scientific tests, experiments, or comparisons.' " <u>Hood</u>, 343 Ill. App. 3d at 1253, quoting 188 Ill. 2d R. 412(a)(iv). The court reasoned that the State violated this rule to the extent that its expert rebuttal witness used extrapolation to compare a hypothetical person's blood-alcohol concentration to the extrapolated blood-alcohol concentration of the defendant had he consumed the amount of alcohol to which he testified. <u>Hood</u>, 343 Ill. App. 3d at 1253.

We note that after the briefing was completed by the parties to the instant appeal, the supreme court reversed the appellate court's decision in <u>Hood</u>. See <u>People v. Hood</u>, 213 Ill. 2d 244 (2004) (<u>Hood II</u>). The supreme court ruled that defendant had waived any objection to the State's presentation of its expert's calculations on rebuttal. <u>Hood II</u>, 213 Ill. 2d at 262-63. In support of its ruling, the court reasoned:

> "The record reveals that the trial court allowed defendant the
> opportunity to speak with the State's rebuttal witnesses in advance of
> their testimony. The trial court expressly advised defendant: 'Go talk
> to them if you want to. We'll give you time.' Nothing in the record
> indicates that defendant acted on the trial court's advice. In addition,
> defendant never requested a continuance to secure his own expert or

to consider more fully Dr. Hindman's expected testimony. Instead, the only relief defendant sought was complete exclusion of Dr. Hindman's rebuttal testimony. *** When defendant elected to forgo more moderate measures available during trial to deal with the State's purported discovery violation, and instead proceeded with trial, the claimed error, if any, was waived." Hood II, 213 Ill. 2d at 262-63.

In the instant case, defense counsel did object to the admissibility of Ferraro's testimony, contending that it would be a discovery violation "because the things they want him to testify to they never tendered to us." However, similar to Hood, defense counsel had the opportunity to speak with the State's expert witness before he testified. Indeed, shortly before his objection to Ferraro's testimony was denied, defense counsel acknowledged to the trial court that he had not attempted to contact Ferraro even though he knew Ferraro was on the list of witnesses. Furthermore, similar to defense counsel in Hood, defense counsel in the instant case did not request a continuance in order secure an expert to counter Ferraro's opinion. Defense counsel did not ask for additional time to prepare for or to consider more fully Ferraro's expected testimony. Accordingly, following the supreme court's holding in Hood II, we conclude the claimed error, if any, was waived.

Defendant further contends that Ferraro lacked the expertise to form an opinion regarding whether a particular image is real or virtual.

We note in Illinois "an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." People v. Jordan, 103 Ill. 2d 192, 208

(1984). "The indicia of expertise is not a given level of academic qualifications, but whether the expert has knowledge and experience beyond the average citizen which would assist the jury in evaluating the evidence." People v. Coleman, 205 Ill. App. 3d 567, 584 (1990). There is no precise requirement regarding how an expert acquires skill or experience, and an expert may acquire knowledge through practical experience rather than scientific study, training, or research. People v. Oberlander, 109 Ill. App. 2d 469, 473 (1969). "The burden of establishing the qualifications of an expert witness is on the proponent of his testimony, and it is within the discretion of the trial court to determine whether the witness has been qualified." Jordan, 103 Ill. 2d at 208.

The trial court expressly found that Ferraro's "knowledge and skill and experience and training and education are greater than the average lay person *** [H]e can assist the jury in reaching the ultimate decision by discussion of some characteristics of computer generated images." A review of Ferraro's professional background reflects that he has extensive practical experience working with images of child pornography as well as a demonstrated knowledge of computer-generated images. In light of this experience and knowledge, we find the trial court did not abuse its discretion by permitting Ferraro to testify as an expert witness.

Defendant contends that Ferraro's testimony as to the ability of graphic artists to morph or create virtual images "is pure hearsay and speculation based on his conversations with graphic artists, not based on his own expertise." Defendant further argues Ferraro's testimony that some of the images depicted "known" children was hearsay.

We are mindful that some of Ferraro's specialized understanding of how to distinguish images of actual children from virtual children was based on discussions with others in the field of

35

computer graphics. We also recognize that Ferraro created the database and its entries on the basis of information given by the investigating authorities of each criminal case from which the images arose. Neither of these facts, however, renders Ferraro's testimony inadmissible hearsay. Indeed, expert opinion testimony may be based upon "facts, data, or opinions not admitted into evidence when such facts, data, or opinions are types reasonably relied upon by experts in the field in forming opinions or inferences upon the subject." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §703.1, at 514 (5th ed. 1990); see also People v. Mertz, 218 Ill. 2d 1, 72 (2005) (if witness possesses specialized knowledge, he may testify as an expert regardless of how he obtained that knowledge, whether through training, education, experience, or a combination thereof).

Defendant also contends that the trial court improperly failed to conduct a hearing pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), in order to determine whether "the area of science that [was] the basis of [Ferraro's] opinions [was] reliable and generally accepted in the scientific community."

The Frye test, often referred to as the "general acceptance" test, is followed in Illinois and "dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 77 (2002), overruled on other grounds by In re Commitment of Simons, 213 Ill. 2d 523, 530-31 (2004), quoting Frye, 293 F. at 1014. If an expert's opinion is not scientific, it is not subject to the Frye admissibility standard. In re Marriage of Alexander, 368 Ill. App. 3d 192, 196 (2006).

"Science" is "a process whereby theories are proposed and refined," and to qualify as

"scientific knowledge," an assertion or inference "must be derived by the scientific method." Whiting v. Coultrip, 324 Ill. App. 3d 161, 166 (2001), citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590, 125 L. Ed. 2d 469, 481, 113 S. Ct. 2786, 2795 (1993). "If an expert's opinion is derived solely from his or her observations and experiences, the opinion is generally not considered [to be] scientific evidence." In re Marriage of Alexander, 368 Ill. App. 3d at 197. "On the other hand, if the expert's opinion is derived from a particular scientific methodology, such as the application of scientific principles or the use of other literature or studies, then the opinion is generally considered scientific." In re Marriage of Alexander, 368 Ill. App. 3d at 197.

In the instant case, the trial court allowed Ferraro to testify to those factors that should be considered when determining whether a given image is of a real person. Ferraro's testimony did not rely on the application of scientific principles, but rather it relied on skill, knowledge, experience, and observations as to what factors should be considered when evaluating whether an image depicts a real person. Accordingly, we conclude that a Frye hearing was not necessary.

## B. Kaiton Bullock

Trooper Kaiton Bullock, who conducted the forensic analysis of defendant's computer, testified regarding the procedures he followed in conducting his analysis and the evidence revealed by his examination.

Defendant contends that the court "erred in allowing into evidence the testimony of Kaiton Bullock with relation to the images of alleged child pornography he found on defendant's computer." Specifically, defendant argues the State failed to establish that "the EnCase software program, which

allegedly made an exact, bit-by-bit copy of the defendant's hard drive, was in proper working condition before he used it to conduct his forensic examination."

"[W]hen expert testimony is based upon an electronic or mechanical device ***, the expert must offer some foundation proof as to the method of recording the information and proof that the device was functioning properly at the time it was used." People v. Bynum, 257 Ill. App. 3d 502, 514 (1994). In the instant case, Trooper Bullock testified regarding both the operation of the EnCase software and his qualifications to operate that software. At the time he conducted the forensic imaging of defendant's hard drives, Bullock had completed the intermediate level EnCase software training, but had not been certified through EnCase Guidance Software. Bullock stated that he had received on-the-job training in EnCase and that his supervisor, Sergeant Murray, was an EnCase-certified instructor.

Bullock stated that he did not test the EnCase software for accuracy before using it to copy the hard drives on defendant's computer. Bullock explained, however, the EnCase software has a computer industry standard built into it, known as MD-5 hash, that utilizes an algorithm to verify that the image it is taking of a hard drive is accurate. Application of this standard during the copying process reflected that the EnCase software was operating properly. Accordingly, we conclude that the State presented sufficient evidence to establish that the EnCase software was functioning properly when Bullock utilized it and ensured that the images presented at trial accurately portrayed the images on defendant's computer.

Defendant also contends that the court "erred in allowing the State to introduce, as substantive evidence, Bullock's self-created spreadsheet." Defendant contends that the spreadsheet

was inadmissible because "it is clearly a police report."

During his examination of the forensic image he created from defendant's hard drives, Bullock "bookmarked" and "exported" 105 images of what he suspected to be child pornography and wrote them onto a compact disk. In addition, he also took information corresponding to the respective files of these 105 images - the photo names, the file creation date, the last access date, the last written date, and the full path names - and organized that information into a spreadsheet. During trial, defendant objected to the admission of the spreadsheet, contending that it was a police report and was therefore inadmissible. The trial court denied defendant's objection, ruling that it was not a police report which described Bullock's actions.

Police reports are generally not admissible into evidence under the business records exception to the rule against hearsay. See 725 ILCS 5/115-5(c)(2) (West 2002). "A potential for grave confrontation clause questions would exist if such records were admitted against the criminal defendant without accounting for the availability of the out-of-court declarant." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.13, at 665-66 (5th ed. 1990), citing People v. Smith, 38 Ill. 2d 13 (1967). However, "investigative reports produced by a machine, such as computer-generated telephone tracing records, are admissible." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.13, at 666 (5th ed. 1990), citing People v. Holowko, 109 Ill. 2d 187 (1985). In the instant case, the spreadsheet was created by collecting information generated by the computer. Accordingly, we conclude that it was admissible.

Defendant contends that even if the spreadsheet was not a police report, it was still inadmissible on hearsay grounds. In support of this contention, defendant relies upon People v.

Casey, 225 Ill. App. 3d 82 (1992). We reject defendant's contention that the spreadsheet was inadmissible on hearsay grounds and find his reliance upon Casey misplaced.

In Casey, the defendant contested the admissibility of an exhibit that displayed information generated by a computer program that was designed to utilize selected phone numbers from various sources and retrieve selected information from other computer records. Casey, 225 Ill. App. 3d at 86. The reviewing court ruled that the exhibit was inadmissible because it was prepared as an aid to an investigation and to litigation and was the product of one individual's own selection process. Casey, 225 Ill. App. 3d at 89. In support of its ruling, the court reasoned that the exhibit was not simply a summary of the retrieved records, but rather was "a compilation of information from various sources, some of which were not verifiable by the defense." Casey, 225 Ill. App. 3d at 89.

Unlike the contents of the exhibit at issue in Casey, the contents of the spreadsheet in the instant case were subject to verification. Indeed, defendant had the computer at his disposal and could have tested the accuracy of the information included in the spreadsheet any time prior to Bullock's testimony. Furthermore, we note that Bullock was available at trial and subject to cross-examination by defense counsel.

## C. Other Crimes

Defendant contends that "the court erred in allowing the State to introduce evidence regarding G.M.'s allegations that the defendant committed an uncharged act of child pornography and statutory sexual assault with regard to the 17-year-old G.M."

"It is well established that evidence of other crimes for which a defendant is not on trial is inadmissible if it is relevant merely to show a propensity to commit crime." People v. Sims, 244 Ill.

40

App. 3d 966, 996 (1993). "The reason for prohibiting this evidence is that such evidence overpersuades the jury, which may convict the defendant simply because he or she is a bad person deserving punishment." Sims, 244 Ill. App. 3d at 996. "An exception to the general rule is that other-crimes evidence is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime, i.e., to show intent, identification, motive, absence of mistake, or modus operandi." Sims, 244 Ill. App. 3d at 996.

The State did introduce evidence of child pornography relating to G.M. through Detective Ciccola's testimony even though it did not charge defendant with child pornography based upon images of G.M. This evidence, however, was admissible as it related to the issues of defendant's intent. See Sims, 244 Ill. App. 3d at 996. This evidence demonstrated that defendant's admission regarding the "young people" or "younger people" on his computer referred to people younger than G.M. Defendant knew he had images on his computer of G.M. naked and engaged in sexual acts and did not hesitate to show them to the police. In contrast, he told the police he was embarrassed to have them view the images of the "young people" or "younger people," which depicted images of children younger than G.M., thereby demonstrating evidence in support of the requisite intent for proving the charged offense of child pornography as it indicated defendant knew that the children depicted in the images were under age 18. 720 ILCS 5/11-20.1(a)(6) (West 2002).

Like the evidence regarding the child pornography related to G.M., the testimony of Officer Dziedicz and Detective Ciccola regarding the "unwanted sex" initially alleged by G.M. was relevant for a purpose other than to show defendant's propensity to commit a crime. Specifically, it was admissible for the purpose of explaining the conduct of the police. See People v. Rivera, 182 Ill.

App. 3d 33, 38 (1989) (evidence properly admitted to explain the conduct of police officers and to prevent the inference that the tactical team had acted in "gestapo" or illegal fashion). During his opening argument, defense counsel challenged the reasonableness of the police officers' conduct by questioning their choice to continue their investigation after they learned of G.M.'s recantation. The evidence regarding G.M.'s allegations of unwanted sex served to refute defense counsel's suggestion during his opening argument that the police acted unreasonably in their investigation.

Finally, we note that the jury learned from the investigating officers that defendant did not rape G.M. The trial court did not abuse its discretion by admitting the above evidence as it related to the circumstances underlying the officers' investigation as well as the reasonableness of their conduct.

### D. Images Related to Count V Charging "lewd exhibition"

Defendant also contends that "the court erred in allowing the State to introduce images of alleged child pornography that were not, as a matter of law, 'lewd' exhibitions and that the introduction of these images prejudiced his defense." In support of this contention, defendant relies upon People v. Lamborn, 185 Ill. 2d 585 (1999).

In Lamborn, the supreme court was called upon to interpret the meaning of the statutory term "lewd exhibition" and ruled that it was required to review the photographs in question to determine whether they were lewd under the child pornography statute. Lamborn, 185 Ill. 2d at 590. The supreme court stated that it was not faced with reviewing the sufficiency of the evidence, and accordingly applied the de novo standard of review. Lamborn, 185 Ill. 2d at 590.

Defendant argues that because the supreme court in Lamborn reviewed the images de novo

to determine whether they were legally lewd, trial courts must, "by extension," also conduct such de novo review before images are presented at trial to the jury. Defendant argues that the trial court severely prejudiced him by refusing to undertake this gatekeeping function required under Lamborn. Specifically, defendant contends that 18 of the images introduced at trial are not lewd as a matter of law. Defendant argues that "because many of the images introduced at trial could not, as a matter of law, constitute child pornography, the court erred in allowing the jury to be overwhelmed with these images, making a cogent defense to the other images impossible."

We are mindful that defendant was charged with and convicted of five counts of child pornography, and that one of those counts (count V) alleged that one or more of the images depicted a "lewd exhibition" of one or more specified body parts. See 720 ILCS 5/11-20.1(a)(6) (West 2002) (referencing activity described in section 11-20.1(a)(1)(vii) of the Criminal Code) (720 ILCS 5/11-20.1(a)(1)(vii) (West 2002)). We note, however, that "[t]he final judgment in a criminal case is the sentence, and, in the absence of the imposition of a sentence, an appeal cannot be entertained." People v. Caballero, 102 Ill. 2d 23, 51 (1984). In the instant case, the trial court merged defendant's convictions on counts II, III, IV, and V (the lewd exhibition count) into his conviction on count I, and sentenced defendant under count I only. Accordingly, we need not consider to what extent any allegedly non-lewd images may have prejudiced the jury against defendant in rendering its verdicts on counts II through V.

The relevant issue is whether the introduction into evidence of the photos which defendant argues are not lewd as a matter of law somehow prejudiced the jury's verdict with respect to count I. We find no prejudice as we have reviewed all of the evidence admitted at trial and conclude, as

discussed later in this opinion, that it overwhelmingly supports defendant's conviction and sentence under count I. Accordingly, we find that any error the trial court may have made by not ruling on whether certain photos were lewd as a matter of law was harmless. See People v. Wallace, 331 Ill. App. 3d 822, 834 (2002) (finding error to be harmless because the evidence overwhelmingly supported the defendant's conviction). We reject defendant's contention that he was denied a fair trial by the introduction into evidence of any photograph which may not have been lewd as a matter of law.

### III. Closing Argument

Defendant contends that "the prosecution impermissibly highlighted other crimes evidence in its closing argument." Specifically, defendant argues that the prosecution commented that the case involved an "investigation regarding child pornography with a 17-year-old girl." Contrary to defendant's contention, this reference was not impermissible. Indeed, the prosecutor was entitled to make such a reference as it was based upon testimony that we previously noted was admissible to show defendant's knowledge and intent and to establish the reasonableness of the officers' conduct. See People v. Nicholas, 218 Ill. 2d 104, 121 (2005) (during closing argument prosecutors may comment on the evidence and any reasonable inference the evidence raises, regardless of whether the inference reflects negatively on the defendant).

Defendant additionally contends that the prosecution "misstated the law by telling jurors that the defendant had committed statutory rape by having sexual relations with a 17-year-old girl, even though such encounters are legal in Illinois." Specifically, defendant contends that the prosecutor told jurors that sexual relations between defendant and 17-year-old G.M. could not have been

consensual because, "She's still 17. It doesn't matter." A review of the record, including the prosecutor's comments preceding and immediately following this statement, does not support defendant's argument. See People v. Tipton, 207 Ill. App. 3d 688, 701 (1990) (arguments of both prosecutor and defense counsel must be reviewed in their entirety, and allegations of improper comments must be placed in their proper context).

The closing argument does not reflect that the prosecutor told the jury that defendant committed statutory rape. Rather, the prosecutor referred to G.M.'s age (17) and the fact that it "doesn't matter" in order to show that the images of G.M. may potentially have constituted child pornography and that the investigating officers thus had an obligation to further investigate her allegations that defendant had taken sexually explicit photographs of her. Moreover, if any of the prosecutor's comments were improper, based on our review of the record, we find any error harmless beyond a reasonable doubt. People v. Caballero, 126 Ill. 2d 248, 273 (1989).

## IV. Jury Instruction

Defendant contends that the trial court erred in modifying his proposed jury instruction defining "lewd exhibition." That instruction related to what the State was required to prove in order to establish defendant's guilt under count V. As noted earlier, however, while defendant was convicted of the offense charged in count V, he was not sentenced on that count. Accordingly we need not address his challenge to the instruction. See Caballero, 102 Ill. 2d at 51 (noting that "in absence of the imposition of a sentence, an appeal cannot be entertained").

## V. Sufficiency of the Evidence

Defendant lastly claims that the evidence was insufficient to prove him guilty of child

pornography beyond a reasonable doubt.

In order to prove defendant guilty of child pornography, the State was required to establish that the pictures in question depicted real children and were not merely virtual, computer-generated images of a children. See Ashcroft v. Free Speech Coalition, 535 U.S. 234, 256, 152 L. Ed. 2d 403, 425, 122 S. Ct. 1389, 1405 (2002) (invalidating section of federal statute which defined child pornography to include material that "appear[s] to be" a depiction of a minor engaged in sexually elicit conduct); People v. Alexander, 204 Ill. 2d 472, 482-86 (2003) (applying holding in Ashcroft to Illinois child pornography statute).

In determining whether the evidence is sufficient to support a conviction, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the offense had been established beyond a reasonable doubt. People v. Collins, 106 Ill. 2d 237, 261 (1985). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." Collins, 106 Ill. 2d at 261.

In support of his challenge to the sufficiency of the evidence, defendant first contends that the State did not prove beyond a reasonable doubt that the images found on his computer were of actual children. Defendant contends that "at most, the jury could conclude the images depicted what 'appeared to be' actual children." The State responds that the testimony of expert witness Daniel Ferraro provided the jury with information it needed to decide for itself what images were, in fact, of actual children. In addition, the State maintains that judges and juries are still able to distinguish between real and virtual images without the assistance of expert testimony.

46

In his reply brief, defendant acknowledges that in People v. Phillips, 346 Ill. App. 3d 487 (2004), the appellate court found that a fact finder may rely on his everyday observations and common experience alone to determine whether images depicted a real, actual child. See Phillips, 346 Ill. App. 3d at 497. Defendant argues, however, quoting Phillips, that "the majority [in Phillips] was simply incorrect in concluding that technology 'has not yet arrived at the point where it is impossible to tell the difference between depictions of real children and virtual images.' " Phillips, 346 Ill. App. 3d at 498.

After completion of the briefing in the instant case, the Illinois Supreme Court reviewed and upheld the decision of the majority in Phillips and squarely addressed the issue of what evidence was necessary to establish that the images of the children before it were real rather than virtual. See People v. Phillips, 215 Ill. 2d 554 (2005) (Phillips II).

In Phillips, detectives first observed the pornographic images in question on the defendant's computer on October 11, 2001. Phillips, 346 Ill. App. 3d at 489-90. The defendant was subsequently charged with one count of possessing, with intent to disseminate, a picture of a child engaged in an act of sexual intercourse and two counts of possessing, with intent to disseminate, a picture of a child engaged in oral sex. Phillips, 346 Ill. App. 3d at 493-94. Following a bench trial, the defendant was convicted of all three counts. Phillips, 346 Ill. App. 3d at 490. "The sole evidence that the pictures admitted at trial depicted real children was the pictures themselves." Phillips II, 215 Ill. 2d at 571.

On appeal to the Illinois Supreme Court, the defendant contended that the pictures alone were insufficient to establish that the images they depicted were of real children. Phillips II, 215

47

Ill. 2d at 571. Specifically, the defendant argued that without evidence other than the pictures themselves, "the most a trier of fact could reasonably conclude beyond a reasonable doubt was that the pictures *appear* to depict real children, not that they do depict real children." (Emphasis in original.) Phillips II, 215 Ill. 2d at 571. The defendant reasoned that the pictures could not stand alone as proof, and that some additional evidence, such an expert opinion, was necessary to connect the logical gap between how a picture looks and what it actually depicts. Phillips, 215 Ill. 2d at 571.

The supreme court rejected the defendant's argument, concluding that the trier of fact in the case before it "could distinguish real from virtual pictures beyond a reasonable doubt simply by viewing the pictures." Phillips II, 215 Ill. 2d at 575. In addressing the defendant's argument, the supreme court acknowledged that expert testimony might have assisted the trier of fact and "could conceivably have shown whether realistic virtual child pornography existed at the relevant time and, if it did, whether the pictures introduced against defendant were virtual images." Phillips II, 215 Ill. 2d at 572-73. The supreme court also acknowledged that prior to the beginning of the case before it, Congress found that highly realistic virtual pornography existed. Phillips II, 215 Ill. 2d at 573. The supreme court further acknowledged that it had given due consideration to this congressional finding. Phillips II, 215 Ill. 2d at 573. After making these observations, however, the supreme court concluded "that the congressional finding was likely incorrect at the relevant time" (Phillips II, 215 Ill. 2d at 575) and found "little or no reason to fear that realistic virtual child pornography exists and was so readily available as to create an unacceptable risk that the trial judge, unaided by expert testimony, mistook legal computer-

48

generated images for child pornography." Phillips II, 215 Ill. 2d at 573. In support of this finding, the supreme court quoted and emphasized the following passage in Ashcroft:

" 'If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice. ' " (Emphasis omitted.) Phillips II, 215 Ill. 2d at 573, quoting Ashcroft, 535 U.S. at 254, 152 L. Ed. 2d at 423, 122 S. Ct. at 1403-04.

The Illinois Supreme Court noted that the above-quoted passage was "clearly correct" and "applies directly to defendant's argument that, for all we know, there are virtual images that are indistinguishable from real ones." Phillips II, 215 Ill. 2d at 574. The supreme court then reasoned as follows:

"Because there is obviously substantial demand for illegal child pornography, people would be all too willing to produce a legal substitute were it readily available. The 'market' for illegal child pornography would quickly be flooded with the legal substitute. Furthermore, the comparison between child pornography and illegal drugs implies a further conclusion, not expressly stated in Ashcroft. If a legal substance that does what marijuana or cocaine do ever became available, it would obviously change the drug trade

49

dramatically. Such a change could hardly go unnoticed, at least in

legal and law enforcement circles. The same applies to child

pornography. If a legal substitute - realistic virtual pornography -

became available, it would dramatically affect the 'market' for child

pornography and *** not go unnoticed. [Citation.] Therefore,

because we are not aware of it now, it is highly unlikely that

realistic virtual child pornography was available on the day

defendant was arrested some 3½ years ago [in October 2001]."

Phillips II, 215 Ill. 2d at 574.

Consistent with the above reasoning, the supreme court reviewed the pictures themselves and

ultimately held that a trier of fact could reasonably find they depicted real children. Phillips II,

215 Ill. 2d at 575.

In the instant case, defendant's computer was seized by the investigating authorities on

August 24, 2001, predating the October 2001 seizure of the defendant's computer in Phillips.

Accordingly, following the supreme court's decision in Phillips II, we conclude it is highly

unlikely that realistic, virtual child pornography was available on the day defendant's computer

was seized. We have reviewed the photos in question, and we conclude that a trier of fact could

reasonably find that they depict real children. Furthermore, we note that in the instant case, the

jurors had the benefit of Daniel Ferraro's expert testimony regarding factors to consider when

deciding whether an image depicts a real rather than a virtual child.

In addition to arguing that the State failed to prove beyond a reasonable doubt that the

images on his computer were of actual children, defendant contends that "the State failed to prove [he] depicted any image by computer, as required by statute."

We note that defendant was not convicted of depicting by computer images of children under section 11-20.1(a)(1)(i) of the Criminal Code. Rather, defendant was convicted of *possessing* "depictions by computer" of children "with knowledge of the nature or content thereof" under section 11-20.1(a)(6) of the Criminal Code. See 720 ILCS 5/11-20.1(a)(6) (West 2002)). "Depiction by computer" under section 11-20.1(f)(5) "means a computer program or data that, after being processed by a computer either alone or in conjunction with one or more computer programs, results in a visual depiction on a computer monitor, screen, or display." 720 ILCS 5/11-20.1(f)(5) (West 2002). Viewing the evidence in a light most favorable to the prosecution, we conclude that the jury had a reasonable basis for finding that defendant possessed, with knowledge of the nature or content thereof, depictions by computer of child pornography. The evidence, including defendant's statement that he had images of "young people" or "younger people" on his computer about which he was embarrassed, proved that he not only possessed depictions by computer of child pornography but knew the nature and content of those depictions.

## CONCLUSION

For the reasons previously discussed, we affirm defendant's conviction for child pornography.

Affirmed.

McNULTY and TULLY, JJ., concur.

1-03-0668