FOURTH DIVISION
April 7, 2011

No. 1-09-2472

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 04 CR 28307 |
| | ) | |
| JOSE RIVERA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | Honorable |
| | ) | Lawrence W. Terrell, |
| | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Gallagher and Justice Pucinski concurred in the judgment and opinion.

## OPINION

After a jury trial, defendant Jose Rivera was convicted of three counts of predatory criminal sexual assault, three counts of criminal sexual assault, and five counts of aggravated criminal sexual abuse arising out of conduct with his 13-year-old stepdaughter and her middle school classmate.  Defendant was also convicted of one count of possession of child pornography. The trial court sentenced defendant to 75 years' imprisonment.  On appeal, defendant contends that: (1) his motion to suppress custodial statements was improperly denied; (2) certain plea-related statements were improperly admitted; (3) the evidence was insufficient to sustain his convictions; (4) the trial court failed to comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); (4) his defense counsel was improperly disqualified; (5) his right to a public trial was violated; (6) certain evidence and testimony lacked proper foundation; (7) certain prior consistent statements were admitted to improperly bolster the credibility of witnesses; (8) a

fatal variance existed between his indictment and the proof offered at trial; (9) defense counsel was ineffective; and (10) statements made during the State's closing argument were improper. For the reasons discussed at length below, we reverse and remand for a new trial.

## I. BACKGROUND

Edys Rivera testified that when she married defendant in 1993, she already had a two-year-old daughter, J.M. Defendant had two other daughters, Evelyn and Maria, from a prior relationship who would visit every other weekend. Mrs. Rivera and defendant had a son together and, along with J.M., they lived in three different towns in the west suburbs of Chicago. During this period, she worked as a receptionist from 8:30 a.m. to 5 p.m. every weekday and 8 a.m. to 6 p.m. every other Saturday, while defendant was a computer technician and worked from 4 a.m. to 12 p.m during the week.

In the fall of 2004, Evelyn came to live with her father and his "second" family. Shortly thereafter, on October 22, 2004, Mrs. Rivera was driving home from work when she received a phone call from the Franklin Park police. She was told that her two daughters were at the station and Mrs. Rivera was told to go to the police station alone. She immediately phoned her husband at that time to inform him of the situation. After arriving at the police station, Mrs. Rivera was informed of a police investigation which involved allegations of a sexual nature between defendant and her 13-year-old daughter, J.M. She signed a consent form permitting the police to search the family apartment.

Mrs. Rivera accompanied the police to the apartment for the search and, upon entering, she noticed a burning smell in the kitchen and "burned stuff" in the sink, even though the sink was

2

in normal condition in the morning. She also noticed that the living room computer, which was assembled and "in working order" in the morning, was on the floor and disassembled. Mrs. Rivera admitted that she only occasionally used the computer and only defendant knew the password to access the computer. During the search, the police recovered, among other things, parts of a computer, a camcorder, a camera, and various digital storage media. Later that day, condoms were recovered from defendant's jacket pocket. She testified that defendant had never used condoms in their intimate relationship.

Defendant's stepdaughter, J.M., testified that she was born on October 21, 1990. J.M. stated that in the spring of 2002, when she was 12, she had several unusual conversations with defendant in his room while her mother was at work. During these conversations, defendant told J.M. that he could help her start a modeling career and form a band with his daughters and another daughter of a friend. He said J.M would make "a lot of money." Defendant told J.M. not to tell her mother because he wanted to "surprise her." Defendant also told J.M. that he signed a modeling contract for her and that an individual named Cindy would arrange for photo shoots and get J.M. clothing. Apparently to that end, defendant took several measurements of J.M. in his room.

After several conversations, defendant eventually persuaded J.M. that, as a part of her contract, she needed to test condoms and some lotion. J.M. indicated that the lotion was intended to be put on her body and defendant would lick it off. As for the condoms, defendant would put one on and J.M. would perform oral sex on him. Although J.M. did not want to test the products, defendant told her it was necessary in order to launch her modeling and music career. J.M.

testified that she told defendant she did not want to test the lotions because she did not want defendant touching her, but would test the condoms if she had to. As a demonstration, defendant retrieved a plastic grocery bag, put it over his penis, and told J.M., "What you do now is the exact same thing you're going to do when we have the condom on." Defendant instructed J.M. to kneel and to put her mouth on his penis and "move [her] head backward and forward." J.M. complied and defendant continued to instruct her. After approximately 10 minutes, defendant removed the bag and J.M. left the room.

J.M. testified that although she was disgusted, she felt she did not have a choice because her career depended on it. The next day, J.M. was in defendant's room again and was told to do the same thing she did before with the grocery bag and she complied. After that day, J.M. testified that defendant would have her perform oral sex on him while he wore a condom once or twice a week. J.M. did not inform her mother because defendant told her that if she ever told her mother, she would disown J.M. and she would be placed into foster care.

In the summer of 2003, J.M. and her family were in the process of moving to Hillside, Illinois. J.M. and defendant continued to have conversations about modeling and her band, with defendant stating that they just had to give it time. At one point, J.M. was told by her mother that if she continued to misbehave at school and in the house, J.M. would be sent to "boot camp." Defendant later took J.M. to see their new house at Hillside. Once there, he told J.M. that if she did not want to go to boot camp, she could perform oral sex on him at that time and he would later talk to her mother. Defendant drove to a nearby drug store and purchased condoms, and the two went into the basement of the Hillside house where J.M. performed oral sex on defendant.

4

After moving to Hillside, J.M. would perform oral sex on defendant throughout the summer according to defendant's requests. J.M. testified that the frequency of the acts varied from one to three times a week, depending on whether her brother or mother was home and defendant's work schedule. Defendant's advances also changed during this time, as he began performing oral sex on J.M., touching and licking her breasts, recording videos of the acts, as well as taking photos of J.M. unclothed.

On one occasion in the summer of 2003, defendant initiated vaginal intercourse with J.M., with the penetration lasting a minute and her screaming in pain. Defendant then abandoned his attempt and made J.M. perform oral sex on him instead. In July 2003, J.M. told defendant she was "sick and tired of everything" and she was "not going to do anything anymore." Defendant then informed J.M. that Cindy was going to sue J.M. and her mother for $200,000. J.M. told defendant that she "would rather be touched by a girl," and in response, defendant told her that if she could find another girl to make a video with, he would "let [J.M] off the hook for a good two weeks." J.M. spoke to a close friend, J.T., and told her she needed help. After hearing an explanation of the situation, J.T. agreed to help but told J.M., "make sure he doesn't talk to me, make sure he doesn't touch me." J.M. then testified as to one distinct occasion when J.T. came over, where defendant had J.M. and J.T. perform oral sex on defendant and how the acts were recorded with a camcorder. J.M. could not remember if sexual acts occurred on other occasions that J.T. visited.

Once J.M. started seventh grade, she stated that the sexual acts had increased up to five times a week. Defendant would have J.M. feed her brother and put him in his room, after which

J.M. would perform sexual acts for defendant. J.M. testified she continued to perform sexual acts because defendant informed her that if she stopped, Cindy would continue to sue J.M. and her mother. After seventh grade, J.M and her family moved to Franklin Park. Defendant continued to have J.M. perform oral sex on him approximately three or four times a week, telling J.M. that Cindy was requiring J.M. to do so to "pay off what you owe [Cindy]." At the Franklin Park residence, defendant would use a webcam to make recordings of the sexual acts to, under J.M.'s belief, send to Cindy. J.M. testified that on one occasion, when she was unwilling to accede to defendant's demand for oral sex, she was told to speak to a woman on the phone whom defendant said was Cindy. "Cindy" told J.M., "listen to your stepfather, he is a good man, just listen to what he says and do what he is telling you to do."

As J.M. started eighth grade, she attempted to stay away from her house as much as possible but defendant still had J.M. perform sexual acts approximately every other Saturday while her mother was at work. On October 11, 2004, defendant told J.M. it was time to make another video, but J.M. refused. Shortly thereafter, J.M. and defendant had a conversation where he threatened a confrontation with Cindy the following Friday, October 22, 2004. Defendant stated that Cindy would be at the residence when J.M. returned from school and warned her that she was "screwed over now." That same day, J.M. wrote a note to a friend relating her fears of being sued, wanting another chance, and wanting to run away. Later that day, J.M. talked with Rosanne Zuccaro, the substitute social worker, and told her what had been happening with defendant, which led school officials to contact the local police.

J.M.'s friend, J.T., testified that she was born on May 6, 1990. During the summer of

2003, J.T. testified that she spoke to her friend nearly every day on the phone. During one phone conversation, J.M. asked her for help because "she had to do some modeling and her step-dad was the one doing it and she needed help in order to get out of it," but was otherwise not specific. Not long thereafter, on a summer afternoon, J.T. was visiting J.M. at her house when defendant called his step-daughter to the basement. After 30 to 45 minutes, J.T. went to the basement to look for her. J.M. ran up to J.T., told her to relax and then blindfolded her. J.M. took her hand and placed it on defendant's penis and told her to give defendant oral sex, which she did. J.T. was eventually told to stop by J.M., and her blindfold was taken off. Defendant told J.T. not to tell anyone because he had her parents' "account numbers," and that if she told anyone, her parents would not be able to buy a house and he would take her away from her parents. J.T. testified she visited three more times over that summer, and defendant had her and J.M. perform various sexual acts. She stated that she did not tell anyone because she was scared her parents would be taken away from her and that her parents would lose their house. J.T. and J.M. did not see each other anymore after the last incident, although they spoke occasionally over the phone. J.T. further testified that she did not tell anyone what had happened until she was contacted by the Franklin Park police in October 2004.

Roseanne Zuccaro testified that on October 22, 2004, she was a teacher at Hester Junior High School in Franklin Park. On that day, Zuccaro was checking her mailbox in the school's office at around 2:30 p.m. when she was asked to fill in for the school's social worker. Zuccaro entered the social worker's office and saw that J.M. was upset. After being asked what was wrong, J.M. said that she had made movies involving sexual acts with her stepfather and that she

did not want to make the movies anymore. Zuccaro and J.M. discussed the situation until 3 p.m., when she told J.M. it was okay to go to volleyball practice. Unsure as to her responsibilities since she was filling in for the social worker, Zuccaro spoke to the assistant principal, prompting notification of the local police department and the retrieval of J.M. from volleyball practice.

Detective Vito Busse testified that on October 22, 2004, he was working as an evidence technician in the investigation for the underlying case. He testified that upon entering defendant's residence, he saw a disassembled computer on the floor that was missing a hard drive. He recovered a number of items from the residence, including a compact disc labeled "Jose's Stuff," a digital camera, a camcorder, various computer disks and components, and a few videotapes which Detective Busse later learned contained recordings of various family events. Detective Busse also testified that it appeared something had been burnt in the kitchen sink. He also observed black material, similar to what was in the kitchen sink, on a toilet seat and a nearby pink towel.

Brad Giglio testified that in October 2004, he was an assistant State's Attorney (ASA) assigned to the child exploitation unit. He interviewed both J.M. and J.T. at separate times, and subsequently met with defendant. During a meeting at around 9 p.m. on October 23, 2004, defendant was read his rights and signed a *Miranda* waiver form. He asked Giglio for guarantees that he would not go to "jail" if he decided to talk about what happened. Giglio responded that he could not give a guarantee because he did not want defendant's statements to be coerced or otherwise based on some sort of promise, resulting in defendant terminating the interview.

Detective Michael Jones testified that on October 22, 2004, he was assigned to the investigation of the underlying case. At around 4:30 p.m. and 5 p.m., J.M. and her mother

respectively arrived at the station. Defendant arrived at 6 p.m., sweating and breathing heavily, and was taken to an interview room. Defendant was read his rights and agreed to speak with Detective Jones. During this time, Detective Jones also learned of the second alleged victim, J.T., and at approximately 2:40 a.m. on October 23, 2004, Detective Jones stated to defendant that "his troubles had just gotten bigger." Defendant asked Detective Jones what guarantees could be made if he gave a confession. Detective Jones stated he could not make any promises and defendant responded he would give a confession but needed another glass of water. Right around this time, an attorney, Michael Clancy, appeared at the station and met with defendant who signed a form indicating that he would not speak with the police. Some 18 hours later, at around 9 p.m., Jones said that defendant again indicated he would give a confession if he was guaranteed no jail time. Detective Jones was with Giglio and testified similarly to the events that Giglio described.

John Griffin, Jr., also testified for the State. He stated that he was an investigator for the State's Attorney's office in Cook County for 13 years as of the time of this particular investigation. At the time of trial, he worked for the Secret Service of the United States. He testified he had been employed in computer analysis work for approximately five years and had experience examining computers and computer components in a variety of cases, including child pornography, computer hacking, credit card fraud, and bank fraud. He also testified that he has examined at least 100,000 files or video clips of child pornography. The trial court declared Griffin to be an expert in the area of computer forensic analysis. Griffin testified that he was asked to analyze a compact disc labeled "Jose's Stuff," and two internal hard drives for child pornography. He testified that the two hard drives contained various documents and several

9

pornographic images; however, the images were of adults. On the compact disc, Griffin testified that it contained various videos, images, music, and documents. He testified that one filed was named, "13-year-old give head," which caught his attention. He offered his opinion that the video contained a "young adolescent performing fellatio on a male subject" and that the male "looked to be older than her." He also opined that the female was "small in stature" with "underdeveloped breasts," and believed the individual in the video was "a juvenile".

On behalf of defendant, Dora Hernandez testified first. She stated she was the mother of defendant's two daughters. She testified that defendant, pursuant to a court order, would pick up his daughters every Saturday at noon and bring them to back to Hernandez on Sunday evenings. She acknowledged that there were some Saturdays when he did not pick them up, usually due to a special occasion. She also stated defendant was a "wonderful father." Both Evelyn and Maria testified as well. They stated that they would visit defendant on the weekends and that they never saw or heard about anything inappropriate occurring between defendant and J.M. Defendant's mother, Ramona LaCourt, testified that she would see her grandchildren regularly on the weekends and J.M. never complained about defendant. Defendant's aunt, J.J. LaCourt-Grant also testified that she saw J.M. regularly and that she never complained about defendant.

Defendant testified on his own behalf. He testified that he worked for a technological company where he served as a supervisor in a department that dealt with circuit boards. The daughters he had with Dora Hernandez would visit every Saturday and Sunday he was not working. He testified he only saw J.T. once or twice when he lived in Berwyn. When living at Berwyn, defendant built two computers for the household, but one of the computers broke after

the family moved to Hillside. When at Hillside, defendant testified that he and Mrs. Rivera began to have personal and financial problems, and were discussing getting divorced. At that time, defendant was seeing an individual named Cindy.

Defendant and Mrs. Rivera sold their Hillside house due to their personal and financial problems and moved to Franklin Park in an effort to rekindle their relationship. While living in Franklin Park, on October 20, 2004, defendant testified that he brought Evelyn to his house to have her live with him because her grades were declining and he believed a change of environment could be beneficial. Defendant testified that Mrs. Rivera was unhappy with the situation and the two fought, and so Evelyn stayed with his aunt that night. On October 21, defendant registered Evelyn in the local school and drove her to school the next day, the day defendant was also called to the Franklin Park police department.

Defendant specifically denied all of the testimony of the two girls about the sexual acts that were related in the State's case-in-chief. He also denied the rather involved testimony about the musical group, lotion and condom testing, and the potential modeling career for his step-daughter. Defendant further denied asking for guarantees regarding probation and imprisonment from then-ASA Giglio or Detective Jones. He explained that the computer in Franklin Park was disassembled because he was attempting to replace the hard drive. Defendant also explained that the burning smell in the kitchen, as well as the ashes in the sink and on a towel, were from an attempt to light a candle in the bedroom to create a romantic atmosphere for his wife. He had lit a piece of paper and walked toward the bedroom, but before being able to light the candle, he turned around back to the kitchen and threw the burning paper into the sink. On cross-

11

examination, however, defendant stated he successfully lit the candle.

Defendant was found guilty by the jury of three counts of predatory criminal sexual assault, three counts of criminal sexual assault, five counts of aggravated criminal sexual abuse, and one count of child pornography. The trial court sentenced defendant to 75 years' imprisonment. This timely appeal followed.

## II. ANALYSIS

### A. Motion to Suppress

Defendant contends that the trial court erred in denying his motion to suppress statements he made to the police. In reviewing a motion to suppress, this court is presented with questions of law and fact. *People v. Terry*, 379 Ill. App. 3d 288, 292 (2008). We give great deference to factual findings by the trial court and will only reverse such findings if they are against the manifest weight of the evidence. *People v. Cosby*, 231 Ill. 2d 262, 270-71 (2008). We, however, review the trial court's legal determination of whether suppression is warranted under those facts *de novo*. *Terry*, 379 Ill. App. 3d at 292.

Defendant filed a motion to suppress which alleged that: (1) defendant was arrested by the Franklin Park police department; (2) defendant was subsequently questioned; (3) attorney Michael Clancy met with defendant; (4) defendant, in the presence of Clancy and Detective Jones, asserted his right to remain silent; (5) defendant signed a written assertion of his *Miranda* rights in the presence of Clancy and Detective Jones; and (6) defendant was subsequently questioned and made statements in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).

Evidence presented at the hearing on the motion to suppress revealed the following

sequence of events: Detective Jones and Deputy Chief Jack Krecker met with defendant at 6:06 p.m. on October 22, 2004. Defendant was read his *Miranda* rights, which defendant indicated he understood. He waived his rights through a signed and initialed form and subsequently engaged in a number of conversations. Clancy received a call at 1:30 a.m. on October 23, 2004, from defendant's uncle and was subsequently retained by him on behalf of defendant. Clancy arrived at the Franklin Park police department at 3:15 a.m, and met with defendant shortly thereafter. Defendant discussed his *Miranda* rights with Clancy and initialed and signed a written assertion of his *Miranda* rights. Clancy left the police department at 3:34 a.m.

At 5:15 p.m., Detective Page entered the lockup area of the police department to take a photo of defendant for use in a photo array. Detective Page did not speak to defendant, but defendant did ask if Detective Jones was in the station. Detective Page answered affirmatively, and defendant asked if he could speak to Detective Jones. Detective Page said, "okay" and relayed the information to Detective Jones. At 9:14 p.m., Detective Jones and ASA Giglio met with defendant. Detective Jones asked defendant if he wanted to speak to them and defendant answered affirmatively. Defendant was again read his *Miranda* rights, which he waived, memorialized by a signed and initialed waiver form. Giglio asked defendant if he had met with an attorney, and defendant answered yes. Giglio also asked defendant if he was self-initiating the instant conversation, and defendant said yes. Defendant spoke to Detective Jones and Giglio until around 9:43 p.m., at which point defendant requested to call his attorney. Defendant was able to reach his aunt and mother, but was unable to reach Clancy, and was then returned to his cell by the police without further conversation. At 10:55 p.m., Clancy returned to the police station and

13

although defendant denied speaking to the police, Clancy advised defendant to not speak and then reinvoked defendant's *Miranda* rights. Defendant argues that he did not reinitiate contact with the police prior to the evening conversation occurring on October 23, 2004, but that instead the police did when Detective Page entered his cell to take a photograph.

*Edwards* held that a defendant, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. Whether a defendant reinitiates contact is subject to a double-pronged inquiry. First, we must determine whether the defendant, rather than the police, initiated the conversation in a manner evincing a "willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). If it is determined that the defendant did reinitiate contact, the next inquiry is whether the defendant, by his or her initiation of such a conversation, coupled with the totality of the other circumstances, knowingly and intelligently waived his right to the presence of counsel and his right to remain silent during custodial interrogation. *Bradshaw*, 462 U.S. at 1046.

Defendant points solely to *People v. Olivera*, 164 Ill. 2d 382 (1995), in support of his argument that he did not reinitiate contact with the police. *Olivera*, however, is readily distinguishable. In *Olivera*, the defendant, after participating in a lineup, asked a detective, " 'what happened[?]' " *Olivera*, 164 Ill. 2d at 387. The detective responded that the defendant was " 'positively identified.' " *Id*. The detective testified the defendant " 'stated that he wanted to know what happens next. I told him I wanted to advise him of his rights, and I advised him of his

14

rights at that time.' " *Id.* Defendant subsequently gave a statement. Our supreme court noted that the defendant's initial question of "what happened" was insufficient to establish, on defendant's part, "a willingness and a desire for a generalized discussion concerning the investigation," failing to satisfy the first prong of the analysis. *Olivera*, 164 Ill. 2d at 390-91. Furthermore, the detective's response that the defendant had been positively identified was "one that could and did elicit further comment by the defendant." *Id.* at 391.

The exchange between Detective Page and defendant was in a entirely different context than the one in *Olivera*. Defendant's first statement to Detective Page, without any prompting, was whether Detective Jones was still in the station. Upon discovering that Detective Jones was still present, defendant requested to speak with Detective Jones. From this simple exchange, it is apparent that defendant unilaterally evidenced a willingness and a desire for a generalized discussion concerning the investigation. In *Olivera*, however, the defendant was subject to a lineup, after which he asked what had happened. There is no indication the defendant in *Olivera* had any initial desire to actually speak with the police regarding the investigation until immediately after the detective indicated to the defendant that he had been positively identified. Had the detective in *Olivera* indicated to the defendant was not identified, one could reasonably believe that the defendant's subsequent response would be considerably different. Here, Detective Page's comments were neutral in character, in that they only confirmed the presence of an individual that defendant already wished to speak to, as opposed to a comment imputing guilt upon defendant, as was the case in *Olivera*. We also note that defendant explicitly acknowledged that he was self-initiating the conversation with Detective Jones. Accordingly, the trial court's

determination that defendant reinitiated contact was not against the manifest weight of the evidence.

Having confirmed that defendant reinitiated contact with the police, we must determine whether defendant knowingly and intelligently waived his right to the presence of counsel and his right to remain silent during custodial interrogation. Given the totality of the circumstances, this court finds that the trial court's determination that defendant's waiver was made knowingly, intelligently, and voluntarily. Defendant had been explained his *Miranda* rights on multiple occasions in written and oral form, including through a conversation with his attorney. Prior to the reinitiated conversation with Detective Jones, defendant was reread his *Miranda* rights and asked if he understood the rights, and he signed and initialed a written waiver form. Defendant was also asked by Giglio whether defendant had met with his attorney and was nevertheless self-initiating the conversation, to which defendant responded affirmatively. Furthermore, defendant has an associate's degree in a technological field, therefore creating little, if any, doubt that he understood his rights. Finally, it is clear defendant understood he was free to terminate the conversation at any point, as it appears he himself terminated the conversation and requested to speak to his attorney. After our own review of the record, we find that the motion to suppress, in the context that it was argued, was properly denied.

As an adjunct to this contention, defendant also argues that he was denied his right to a fair trial when the trial court allowed testimony that the conversations were "terminated," because they constituted improper comments on defendant's postarrest silence under *Doyle v. Ohio*, 426 U.S. 610 (1976). *Doyle* held the State's use of a defendant's silence, at the time of arrest and after

16

receiving *Miranda* warnings, for impeachment purposes violated the due process clause of the fourteenth amendment. *Id.* at 619. As a threshold matter, we note that defendant never objected to any comments or questions at trial relating to the termination of the conversations and did not include the issue in his posttrial motion. Defendant, however, urges us to examine this under the plain error doctrine.

Under the plain error doctrine, we will review unpreserved error when either (1) the evidence is closely balanced, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step of plain error analysis is deciding whether any error has occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). If an error is deemed to have occurred, we turn to the prongs of the plain error analysis.

Defendant points to a number of references concerning the alleged misuse of defendant's postarrest silence. On a variety of occasions during their respective testimonies, Giglio and Detective Jones noted that defendant "terminated" an interview. Defendant claims that it "could not have been lost on the jury after repeated references that Defendant terminated the interrogation that he had invoked his right to silence." While we agree that it is generally error to comment on a defendant's postarrest silence, " '[i]t is not error to elicit a complete recitation of police procedure, even if the recitation includes reference to a defendant's exercise of his constitutional rights, so long as the recitation is not argued to be indicative of guilt.' " *People v. Leak*, 398 Ill. App. 3d 798, 820 (2010) (quoting *People v. Lindgren*, 111 Ill. App. 3d 112, 117 (1982)). First, there were no comments that defendant explicitly exercised any constitutional

17

rights. While certain witnesses did indicate that some interviews were "terminated," it only served to establish a timeline of events for the sake of clarity as opposed to any suggestion of guilt. More importantly, the State never argued or intimated that the "termination" of interviews was an indicia of guilt or otherwise attempted to focus the jury on defendant's silence. After a careful review of the record, including the dialogue between the State and its witnesses, we find no error here.

### B. Plea-related Custodial Statements

Defendant further attacks the substance of the admitted conversations with police by contending that the State violated his right to a fair trial because the conversations were evidence of his attempts to plea bargain, as he offered to confess if he were to receive only probation. Rule 402(f) provides that, "[i]f a plea discussion does not result in a plea of guilty, *** neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." Ill. S. Ct. R. 402(f) (eff. July 1, 1997). Defendant acknowledges that he failed to preserve this issue on appeal as he did not object to the usage of the statements at trial, but urges us to overlook his forfeiture.

As stated above, we must first determine whether any error occurred as part of a plain error analysis, which requires us now to examine whether defendant's statements were plea-related. Our supreme court, in *People v. Friedman*, 79 Ill. 2d 341 (1980), established a two-prong test to determine whether a statement is an inadmissible plea-related statement. A statement is a plea-related and inadmissible if: (1) the defendant exhibited a subjective expectation to negotiate a plea; and (2) the expectation was reasonable under the totality of the objective

circumstances. *Friedman*, 79 Ill. 2d at 351. The "characterization of a statement as plea-related is fact specific, and courts may consider a variety of factors in making this determination." *People v. Jones*, 219 Ill. 2d 1, 27 (2006).

At trial, various State witnesses noted that while defendant was in custody, he repeated during a series of interviews that, in exchange for his "confession," he wanted "guarantees" that he would receive probation as opposed to imprisonment. Giglio remarked on this various times, including testifying that defendant "was adamant about not wanting to do any jail, about wanting to get probation. He said he would talk to us about what we were there to talk to him about if he had those guarantees." Detective Jones also stated that defendant asked "if he gave a confession what guarantees would he have," and that defendant "wanted to know that he had guarantees that he was not going to go to jail if he spoke to us." Detective Jones also remarked that, during the same conversation, defendant stated, "I will give you a confession. Just go get me another glass of water." Finally, during closing arguments, the State reiterated Detective Jones' testimony, that "the defendant said if he gave a confession, what guarantees did he have." The State argued during opening statements that defendant had attempted "to broker a deal with the police in exchange for telling them what really happened," and then later argued defendant's statements were "inculpatory" and "admissions of guilt."

The appropriate inquiries here are whether defendant exhibited a subjective expectation to negotiate a plea and whether his expectations were reasonable under the totality of the objective circumstances. We answer both inquiries affirmatively. We first acknowledge that our supreme court has noted that "offers to cooperate, without more, do not constitute plea negotiations or

offers to enter into plea negotiations." *People v. Hart*, 214 Ill. 2d 490, 507 (2005). The factual scenario presented here, however, indicates defendant offered much more than mere cooperation. The State primarily relies upon *Hart* in arguing no plea-related statements were made, but the defendant there suggested only that he "might be willing to cooperate with Detective Beck." *Hart*, 214 Ill. 2d at 511. The supreme court, in finding that the "rudiments of the negotiation process" were not present, found significant that the defendant only desired to know what Detective Beck and no one else could do, that no contact was made with the State's Attorney, and the defendant did not state what "cooperation" entailed nor specify what he would require in exchange for cooperation. *Id.* at 511. In the case at bar, however, defendant did not speak only to Detective Jones regarding guarantees, but also to ASA Giglio, whom defendant believed was prosecuting the matter. Defendant was clearly attempting to bargain for a specific sentence, and specified that his cooperation would consist of a confession to the crimes he was being held for. While we note that a confession, in certain circumstances, might not be equivalent to a plea of guilty, defendant here specifically requested a guarantee that he would receive probation as opposed to any imprisonment if he confessed. From that, it is apparent to this court that defendant was negotiating a circumvention of the trial process and willing to subject himself to sentencing, that is, plead guilty, if it could be guaranteed he would receive probation. The rudiments of the negotiation process are clearly present here.

This case is more analogous to the facts in *Friedman* as opposed to *Hart*. In *Friedman*, testimony by a State's Attorney investigator was elicited that the defendant, over the phone, provided an unsolicited statement where he inquired about "making a deal" and stated, " 'If I'm

convicted, I would rather go to a Federal prison as opposed to a State prison,' " to which the witness responded with, " 'I have no control over that, talk to Mr. Rosenberg.' " *Friedman*, 79 Ill. 2d at 350. The supreme court held that was sufficient to constitute a plea-related statement. *Id.* at 352. We find the defendant's statements here to be the legal equivalent of those in *Friedman*. We accordingly find that defendant exhibited a subjective expectation to negotiate a plea, and under the totality of the objective circumstances discussed above, defendant's expectations of negotiation were reasonable and the statements were, therefore, inadmissible.

Having found that an error did occur, we must now determine whether such an error warrants reversal. We find that it does under the second prong of the plain error doctrine. First, the fact that little negotiation actually took place is of little importance, as our supreme court has held that "an offer to enter negotiation is indistinguishable from a statement made at an advanced stage of the negotiation process in terms of its impact upon a jury." *Friedman*, 79 Ill. 2d at 352. Second, and most importantly, this court and our supreme court have held that testimony relating such information has a "devastating effect" and is prejudicial even in the presence of overwhelming evidence against the defendant. *Id.* at 352; see *People v. Hoerer*, 375 Ill. App. 3d 148, 154 (2007); *People v. Ousley*, 297 Ill. App. 3d 758, 764 (1998); see also *People v. Hill*, 78 Ill. 2d 465, 472 (1980). We believe this assessment is applicable under the specific facts of this case. Defendant's plea-related statements were offered by two State witnesses and also argued with emphasis during the State's closing arguments. Given the potentially devastating effect of such testimony and the impossible task of parsing out what actual effect it had on the jury, we must reverse defendant's convictions and remand for a trial on this issue. The State must refrain,

21

during retrial, from introducing any of the plea-related statements detailed above.

Because we reverse on this issue, certain issues on appeal have been rendered moot, but we will address any issue that could occur again on retrial or otherwise provide guidance in future proceedings.

## C. Double Jeopardy

Because we reverse on the grounds stated above, we are now bound to consider the double jeopardy implications of our finding that the use of inadmissible plea-related statements warrants reversal. The double jeopardy clause prohibits retrial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding. *Burks v. United States*, 437 U.S. 1, 11 (1978). It does not, however, preclude retrial where a conviction has been set aside because of an error in the proceedings leading to the conviction. *People v. Mink*, 141 Ill. 2d 163, 173-74 (1990). Furthermore, "retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for the purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *Olivera*, 164 Ill. 2d at 393 (citing *Lockhart v. Nelson*, 488 U.S. 33 (1988)).

When reviewing the sufficiency of the evidence, the appropriate standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)).

We first consider defendant's convictions related to J.M. and J.T. After viewing the relevant evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of the charges related to J.M. and J.T. beyond a reasonable doubt. However, this determination is not binding on retrial and is not intended to express an opinion concerning defendant's guilt or innocence. Accordingly, we find no double jeopardy impediment to retrial as to any of defendant's convictions directly related to J.M. and J.T.

We next consider defendant's conviction of possession of child pornography under section 11-20.1(a)(6) of the Criminal Code of 1961. 720 ILCS 5/11-20.1(a)(6) (West 2008). A person commits the offense of child pornography under section 11-20.1(a)(6), who:

> "with knowledge of the nature or content thereof, possesses any film, videotape, photograph or other similar visual reproduction or depiction by computer of any child or severely or profoundly mentally retarded person whom the person knows or reasonably should know to be under the age of 18 or to be a severely or profoundly mentally retarded person, engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection[.]" 720 ILCS 5/11-20.1(a)(6) (West 2008).

We find defendant's conviction based on section 11-20.1(a)(6) to be problematic. The evidence presented in support of defendant's conviction on this charge was primarily based upon possession of a compact disc, labeled "Jose's Stuff," which contained a video clip allegedly depicting a minor performing oral sex on a male. The video clip was viewed by the jury during the State's case-in-chief. Most of the remaining evidence in support of the pornography charge came in testimony by John Griffin, Jr., who was employed as an investigator with the State's

Attorney's Office at the time of this investigation.

Defense counsel stipulated that he was an expert, but only in the area of computer forensic analysis. The relevant testimony Griffin offered follows:

"[GRIFFIN]: There was a particular video that says, '13-year-old give head', so that was a red flag for me.

[STATE]: In fact, you were looking for child pornography, is that correct?

A: I was, ma'am.

Q: And '13-year-old give head' alerted you?

A: Absolutely.

Q: Okay. Did you, in fact, watch that video that was titled, '13-year-old give head'?

A: I did, ma'am.

Q: And could you please describe to the Ladies and Gentlemen of the Jury what you observed in that video?

A: I observed a young – seemed to be a young adolescent performing fellatio on a male subject, he looked to be older than her, his head was not in the video, he was laying back on the bad or sofa, she was on her knees, and I can tell she was small in stature, underdeveloped breasts.

Q: Did you believe the female depicted in that video was a juvenile?

A: I did, ma'am."

Griffin reiterated similar testimony on redirect examination.

1-09-2472

We first acknowledge that "in determining child pornography, based upon its everyday experiences, a trier of fact can determine from a photograph whether a child is under 'the age of sixteen.' " *People v. Schubert*, 136 Ill. App. 3d 348, 354 (1985). In other words, images and videos speak for themselves in determining whether such media constitutes child pornography. See *People v. Phillips*, 346 Ill. App. 3d 487, 497 (2004); *People v. Thomann*, 197 Ill. App. 3d 488, 497-98 (1990). With this in mind, after reviewing the record and viewing the video at issue, this court has made a number of troubling observations. The video was 11 seconds long, lacked audio, and was recorded at a low resolution. The female subject is fully clothed with a sweater and evident bra undergarment at the very beginning. The male participant is never seen, except for his penis, which is visible for the approximately seven seconds of recorded fellatio. Although the female had apparently removed her sweater prior to the sex act, only her shoulders, face and right hand are visible during the fellatio portion of the video. Nothing beneath her shoulders is observed and there is nothing which would indicate whether her breasts were "underdeveloped." Most importantly, the female subject is not obviously adolescent or juvenile in appearance.

As to Griffin, the defense stipulated he was an expert in computer forensics only. Although we acknowledge Griffin testified to an extensive background in computer forensics as it related to child pornography, he was not a recognized expert in human figures, anatomy, medicine, or any field that might translate to an expert ability to determine the age of an individual by observing a brief video clip. Essentially, although he was permitted to testify, over objection, as to the age of the individual in the video clip, he was in no better position to determine the age of the individual depicted in the video at hand than the jury or this court. We also note that while

25

we afford great deference to jury determinations on credibility and demeanor of witnesses, as they are in a superior position to a reviewing court in observing witnesses while testifying (see *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007)), the primary evidence here is a video clip which the jury is in no better position to view than this court. We are not suggesting the jury is still not afforded substantial deference as the trier of fact; however, where certain evidence does not involve credibility determinations or observations of demeanor, the deference afforded is logically less.

Also troubling is the fact that, contrary to Griffin's testimony, the file name from the disc did *not* putatively contain the age of the female participant. Rather, it was numbered 13 in a long list of numbered videos and photographs, with the literal file name being "13givehead." The abbreviation "y.o." is not in the video title, or anywhere on the disk itself. On the disk's enumerated contents, it was preceded by images numbered 1 through 12 and followed by an image numbered 015-0015, with no suggestion that any others included subjects who were ages 1 through 15. The jury viewed only file 13 and none of the other numbered files. The prejudicial effect of specifically identifying the female in this video as a "13-year-old" is obvious in this case where defendant was accused of aggravated sexual abuse of two girls that specific age, particularly where there is nothing on the video to outwardly suggest that the participant in the sex act was that age. The State compounded this problem by attempting to deride any possible "coincidence" during closing argument: "There's a coincidence that there's some child pornography on here with a young girl, like, you know, a juvenile performing oral sex on a guy. Wow, that's a coincidence. That's kind of the same thing that these girls have been talking

1-09-2472

about."

Allowing this testimony and argument, despite the absence of any evidence that the female in the video clip was, in fact, a 13-year-old, was error. We are, however, bound to consider all evidence in a light most favorable to the State, including erroneously admitted evidence for purposes of a double jeopardy analysis. Even after doing so, however, a simple viewing of the video clip itself creates reasonable doubt as to defendant's conviction on this specific charge. It is the judgment of this court that the protections of double jeopardy on the child pornography count preclude any retrial on that charge. Obviously, the video may not be shown on retrial.

D. Supreme Court Rule 431(b)

Defendant contends that the trial court failed to properly question the prospective jurors regarding whether they understood and accepted certain principles, as required by Supreme Court Rule 431(b). Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Defendant does not dispute that he failed to object to this alleged error. Nonetheless, he asserts that a Rule 431(b) violation requires automatic reversal or that reversal is required under the plain error doctrine.

Rule 431(b) is a codification of our supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472 (1984), which held that the trial court erred by refusing the defendant's request to ask the venire about four fundamental principles of law. *Zehr*, 103 Ill. 2d at 476-78. The four *Zehr* principles are that (1) the defendant is presumed innocent; (2) the defendant must be proved guilty beyond a reasonable doubt; (3) the defendant is not required to produce any evidence; and (4) the defendant's failure to testify cannot be held against him. *Zehr*, 103 Ill. 2d at 477. Pursuant to Rule 431(b), the trial court must address the *Zehr* principles, even in the absence of a specific

27

request by the defendant and "shall ask each potential juror, individually or in a group, whether that juror understands and accepts" those principles, and "[t]he court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

This issue has been rendered moot, as we have already determined that the Rule 402(f) violation discussed above warrants reversal and any jury on retrial will presumably have an entirely different composition of individuals. Nevertheless, we note that during *voir dire* of the instant case, the trial court addressed the potential jurors as a group and stated each *Zehr* principle but erred by not asking the potential jurors whether they understood and accepted the principles as required by Rule 431(b). Any potential error on retrial can be easily avoided by a simple recitation of the Rule 431(b) principles and a subsequent confirmation that the jurors understand and accept them.

### E. Disqualification of Defense Counsel Michael Clancy

Defendant contends that the trial court abused its discretion in disqualifying his originally retained attorney, Michael Clancy, from representing defendant at trial. While the issue is moot, we believe there exists a possibility that similar issue could arise on retrial and thus will comment on it. The relevant facts are as follows: Clancy was retained by defendant while he was in custody at the Franklin Park Police station on October 22, 2004, and he subsequently filed a number of pleadings on behalf of defendant. On October 30, 2006, Clancy filed a motion to suppress statement which alleged: (1) On October 27, 2004, Clancy met with defendant at the Franklin Park police department; (2) defendant, in the presence of Clancy and Detective Jones,

28

asserted his right to remain silent; (3) defendant signed a written assertion of his *Miranda* rights in the presence of Clancy and Detective Jones; and (4) was questioned and made statements in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).

A hearing on the motion to suppress was held nearly two years later. Just prior to the hearing, however, the State moved to disqualify Clancy. The trial court found that the "written motion actually renders Michael Clancy as a material witness," and subsequently disqualified him and ordered Michael Goggin to substitute on the motion to suppress. After the hearing, Goggin requested that the circuit court reconsider Clancy's disqualification but the request was denied. Goggin filed a motion to reconsider Clancy's disqualification on August 7, 2008, but the motion was denied, as was Goggin's later attempt to renew the motion just prior to trial.

There is a presumption in favor of a defendant's choice of counsel; however, the sixth amendment right to choose one's own counsel is not absolute, and chosen counsel may be disqualified if a serious potential for a conflict of interest exists. *People v. Holmes*, 141 Ill. 2d 204, 217 (1990). In determining whether a conflict of interest exists such that counsel must be disqualified, a trial court engages in a two-step analysis. First, the trial court must first determine whether an actual conflict of interest exists or there is a showing of " 'serious potential for conflict' " between an attorney's interest and his or her client. *People v. Ortega*, 209 Ill. 2d 354, 361 (2004) (quoting *Wheat v. United States*, 486 U.S. 153, 164 (1988)). If a conflict is found, the next determination is whether the interests threatened by the conflict overcome the presumption favoring defendant's chosen counsel. *Ortega*, 209 Ill. 2d at 361. The trial court may consider various factors in making this determination, including: (1) the defendant's interest in

having the undivided loyalty of counsel; (2) the State's right to a fair trial; (3) the appearance of improbity should the jury learn of the conflict; (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction; and (5) whether the State's claim that a conflict warrants disqualification is the result of overreaching. *Ortega*, 209 Ill. 2d at 361-62.

We review a trial court's finding of a serious potential for conflict under the abuse of discretion standard. *People v. Collins*, 382 Ill. App. 3d 149, 153 (2008). "An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful or where no reasonable person would take the view adopted by the trial court." *People v. Childress*, 338 Ill. App. 3d 540, 545 (2003).

As a threshold matter, defendant cites to *Burnette v. Terrell*, 232 Ill. 2d 522 (2009), in support of his assertion that the trial court failed to appropriately consider the aforementioned *Ortega* factors. While we agree that a complete lack of any reasoning within the record for disqualification would render meaningful review of the instant issue impossible, a trial court need not explicitly engage in a specific evaluation of each *Ortega* factor on the record when making its determination. *People v. White*, 395 Ill. App. 3d 797, 828 (2009).

We find that the trial court did not abuse its discretion here. As stated, a trial court may disqualify defense counsel where there is serious potential for a conflict of interest. Given that a considerable amount of the State's evidence involved events occurring within the police station and that Clancy had previously testified during a motion to suppress, the trial court correctly found, after hearing multiple arguments from the State and defendant, that "it is likely that the State could call Attorney Clancy as a witness under a more credible factual scenario." Clancy had

30

already testified to certain events occurring at the Franklin Park police department and the State believed there was potential Clancy may be required to testify as to other surrounding events, which the trial court agreed with. We do not find this determination to be arbitrary, fanciful, or such that no reasonable person would take the view adopted by the trial court, especially when considering the State's case and defendant's theory at trial that challenged the veracity of various individuals at the police department. Although the State did not call Clancy as a witness in the original proceedings, we find that to be irrelevant as we decline to engage in a hindsight analysis in determining whether a trial court properly exercised its discretion. Accordingly, the trial court did not err here.

Furthermore, we find that the sole case defendant relies on in support of his argument is distinguishable. In *People v. James*, this court reversed the trial court's disqualification of a defendant's attorney. *People v. James*, 368 Ill. App. 3d 433, 437 (2006). In *James*, a defendant's original jury was deadlocked on a serious charge but a codefendant was acquitted in a separate trial. The defendant discharged his attorneys and retained codefendant's attorneys. Defendant's new attorneys conducted an interview with codefendant, which was memorialized in a written report prepared by codefendant's new counsel. Just prior to trial, it was revealed the codefendant would be called as a defense witness. The State subsequently moved to disqualify defendant's attorney, arguing that should codefendant testify inconsistently, the State would be forced to call defendant's attorneys as witnesses. The trial court granted the motion and this court reversed. However, the basis for the reversal was based on a number of factors: (1) co-defendant had waived any attorney-client privilege between him and defendant's attorneys and

31

any accompanying confidentiality; (2) the potential for defendant's attorneys to be called as witnesses was highly speculative as no report of the interview existed in the record; and (3) codefendant's new counsel could have testified as to the content of the interview if needed. Put simply, none of those factors exist here and we therefore find *James* to be factually unpersuasive.

### F. Right to a Public Trial

Defendant next contends he was denied his right to a public trial when nonwitness family members were allegedly excluded from the courtroom. Again, because we have reversed on a separate issue, we find that this issue is moot and any discussion relating to it would provide no guidance to the parties or the trial court on retrial. Accordingly, we decline to address it.

### G. Foundation of Visual Recording of Alleged Child Pornography

Defendant next contends that the trial court abused its discretion in admitting a visual recording without a proper foundation. The visual recording was evidence offered only in support the charge of possession of child pornography, a charge which we have determined is subject to a double jeopardy impediment. Because the visual recording had no bearing on defendant's remaining convictions that have no similar impediment, we find this contention to be moot and decline to address it.

### H. Mrs. Rivera's Testimony Regarding Defendant's Computer

Defendant next contends that the trial court erred in allowing Mrs. Rivera to "opine" that defendant's computer was "in working order." Defendant argues that no foundation was offered to support her conclusion. Again, defendant acknowledges that he did not properly preserve this issue on appeal, but because it is evidentiary in nature and may arise again on retrial, we are

1-09-2472

inclined to comment on it.

We believe that this is not a foundation issue, but whether her testimony was proper as a lay witness. Turning to the testimony in question, Mrs. Rivera was asked by the State, "As far as you know when you left that morning, the computer was assembled and in working order; is that right?" To which she answered, "Correct." This court finds that the testimony did not offer an opinion, but merely her personal observations. A lay witness may properly testify to observations or sensory perceptions, although the offering of opinions or interpretation of those observations are generally improper. *People v. McCarter*, 385 Ill. App. 3d 919, 934 (2006). From the context of the testimony and evidence presented, Mrs. Rivera was simply stating that, although the computer later appeared disassembled, the computer was fully assembled before she departed for work that day. She offered absolutely no interpretation or opinion as to why the computer was disassembled, which would have been inadmissible. Instead, it was defendant who testified as to the reasons for disassembly. Defendant himself testified that on October 22, 2004, the computer in question was in working order and that he only disassembled the computer because the hard drive was making a noise. In any event, we find that it was not improper for Mrs. Rivera to testify that, to her knowledge and observation, a computer appeared to be fully assembled and in working order, so long as she refrained from attempting to explain why the computer later appeared to be disassembled.

## I. Prior Consistent Statement

Defendant next contends that the trial court erroneously admitted a note written by J.M. as a prior consistent statement which improperly bolstered her credibility. At trial, J.M. testified

33

that she had reached out to a friend, E.S., on the same day she spoke to a school teacher, Ms. Zuccaro. As to E.S., J.M. testified she had sent a note to her, and the State introduced the note as an exhibit which the trial court admitted into evidence. Defendant asserts this was in error. Again, defendant did not preserve this issue for review on appeal, but as it is an evidentiary matter that may occur again on retrial, we will address it.

As a general matter, statements made prior to trial are inadmissible for the purpose of corroborating trial testimony or rehabilitating a witness. *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005). Prior consistent statements, however, are admissible in two circumstances: (1) where there is a charge that the witness has recently fabricated the testimony, or (2) where the witness has a motive to testify falsely. *People v. Heard*, 187 Ill. 2d 36, 70 (1999). In either circumstance, the prior consistent statement must have been made before the alleged fabrication or motive to lie arose. *Id.* at 70.

Defendant argues the note to E.S. was inadmissible because it served as repetition of J.M.'s testimony, improperly bolstering her credibility. After an examination of the note, J.M.'s testimony, and defendant's claims at trial, we agree. First, we note that the State asserts that the note was admissible under section 115-10 of the Code of Criminal Procedure of 1963 as a child sex victim outcry statement. 725 ILCS 5/115-10 (West 2008). Section 115-10 requires, among other things, that such testimony is admissible if "the out of court statement was made before the victim attained 13 years of age or within 3 months after the commission of the offense, whichever occurs later, but the statement may be admitted regardless of the age of the victim at the time of the proceeding." 725 ILCS 5/115-10(b)(3) (West 2008). The note was written on October 22,

2004, and defendant's birthday falls on October 21, 1990, therefore J.M. was too old for the note to be admissible due to her age. Furthermore, a careful examination of the record indicates that it was never clearly established when the last sexual act between defendant and J.M. occurred and thus the note was also not admissible pursuant to the "within 3 months after the commission of the offense" language of section 115-10. See *People v. McDade*, 345 Ill. App. 3d 912, 915 (2004) (continuing offenses, such as predatory criminal sexual assault, are not completed until the last act was accomplished). Accordingly, the State's argument that the note was admissible at the original proceedings under section 115-10 is misguided.

Furthermore, we agree that some of the content of the note is repetitive of testimony J.M. had previously given. Among the statements in letter are that a "lady is going to sue," J.M's mom would be taken away, J.M. was scared, and that "if this lady does what she says she's gona [*sic*] do I won't be living here in Franklin Park any longer." To the extent the letter repeats J.M.'s testimony, it is inadmissible. Although it is true that, at trial, defendant argued that J.M.'s allegations were fabricated or had a motive to testify falsely, the prior consistent statement must pre-date the fabrication or motive to lie. *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010). Here, defendant's theory at trial suggested a motive to lie existed due to Evelyn moving into the family's residence, which occurred before the note at question was written. We further do not find anything, nor has the State presented any argument that there is anything, in the evidence to suggest that the statement in question qualifies for admission under any exception. See *People v. Deavers*, 220 Ill. App. 3d 1057, 1073 (1991).

It is important to note that this analysis is based solely on the specific circumstances of the

original proceeding. We are not holding that the note in question would never be admissible or that mentioning the fact the note was written is inadmissible. Furthermore, our comments on this issue are intended to be merely instructive in future proceedings in the instant matter, as we acknowledge that the note in question may very well be admissible under slightly different circumstances.

## J. Fatal Variance of Count XIII

Defendant next contends that he was not found guilty of criminal sexual assault beyond a reasonable doubt, specifically count XIII of the indictment, where he was charged with two acts of assault involving contact of a penis with a vagina for different time periods, but J.M. testified only to one act of contact. The State agrees. Because we have remanded for a retrial, this issue has become moot. However, we briefly note that defendant's contention here is correct. Count XIII charges defendant with criminal sexual assault, alleging contact between defendant's penis and J.M.'s vagina on or about October 21, 2003 to October 10, 2004. J.M.'s testimony directly contradicted this allegation, as she testified defendant made contact between his penis and her vagina only once during the summer of 2003. Therefore, defendant was improperly found guilty of this offense.

## K. Ineffective Assistance of Counsel

Defendant advances a number of arguments as to how his counsel was ineffective at trial. Because we have reversed and remanded for a new trial on other grounds, we find defendant's arguments to be moot and decline to address them.

## L. Police Report Admissibility

Defendant next contends that the trial court erred in admitting evidence contained in a police report. Police reports are generally inadmissible hearsay. *People v. Shinohara*, 375 Ill. App. 3d 85, 113 (2007). They can be used, however, for purposes of impeachment or refreshing a witness' recollection. *People v. Williams*, 240 Ill. App. 3d 505, 506 (1992).

Here, we acknowledge that defendant was the first to ask Detective Jones to refer to his police report in the instant case. Defense counsel asked Detective Jones, on cross-examination, a series of questions concerning a conversation he had with J.T. For example, defense counsel asked whether J.T. informed Detective Jones that she was afraid her parents were going to lose her house or mentioned defendant ever picking her up with his truck. Detective Jones stated he could not recall and was subsequently asked to refer to his police report to refresh his memory, after which he stated he did not remember J.T. relating such information to him. On redirect, the State revisited the conversation between J.T. and Detective Jones, inquiring about other statements J.T. related. Initially, the State referred to the police report in asking whether J.T. made a particular statement to Detective Jones, such as, "Doesn't the report also say [J.T.] said she was afraid Cindy would sue her family?" and "the report that counselor indicated talks about this Cindy person, correct?" However, the vast majority of the redirect did not reference the police report and only inquired as to the conversation that took place between J.T. and Detective Jones.

While we might find that continued references to a police report would be improper, it is clear that the State was merely relating other portions of the conversation that occurred between him and J.T. On cross-examination, defense counsel had elicited portions of the same

conversation between Detective Jones and J.T., using the police report to refresh his memory. The State was simply attempting to do the same in an attempt to introduce the remaining balance of the conversation that had occurred, which is acceptable. See *People v. Stevens*, 255 Ill. App. 3d 812, 815 (1992) (holding that where defense counsel had elicited portions of a conversation between police officer and rape victim, police officer could properly testify to the remaining balance of the conversation). After a careful analysis of the testimony, we find no error occurred here.

### M. State's Closing Argument

Defendant next contends that it was error when the State directed to jury to conduct its own handwriting comparison of the writing on the compact disc labeled "Jose's Stuff," and the signature on a *Miranda* waiver. This issue is also moot as a result of our determination that a retrial is warranted, but given the nature of the contention we are inclined to briefly comment.

During closing arguments, the State argued:

"But when you look at this 'Jose's Stuff,' if you really want to know the audacity of the defendant, take a look at his *Miranda* waiver too. Now, I'm not a handwriting person, but that's a pretty distinctive J that he signed when he admitted he signed his name Jose Rivera. The same J is on 'Jose's Stuff.' "

We have held that a "trier of fact may examine handwriting exemplars to determine the source of questioned handwriting but in the first instance the comparison must be made in open court and in the defendant's presence." *People v. Hoover*, 87 Ill. App. 3d 743, 748 (1980). This, however, did not occur. Furthermore, while it is not improper for the jury to draw reasonable inferences

from the evidence, we find it improper for the State to directly opine as to the similarities between what was written on a compact disc and a *Miranda* waiver, particularly where no handwriting expert testified at trial. Similar comments should be avoided at retrial.

### III. CONCLUSION

In conclusion, we reverse defendant's convictions and remand for a new trial based on the improper admittance of plea-related statements at trial. The principles of double jeopardy do not preclude retrial as to any charges relating to J.T. and J.M., however, we have found double jeopardy does preclude retrial as to defendant's child pornography charge. To reiterate, plea-related statements and evidence in support of only the child pornography charge should not be admitted upon retrial. Our analysis of other evidentiary issues we have commented on are intended to be instructive, but not necessarily controlling, in future proceedings, as we acknowledge different circumstances may alter the ultimate admissibility of evidence at retrial.

For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for a new trial.

Reversed and remanded.

REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each Case)

| Please Use Following Form: | THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the Circuit Court of Cook County. |
|---|---|---|
| Complete TITLE of Case | Plaintiff-Appellee, ) ) v. ) ) JOSE RIVERA, ) ) Defendant-Appellant. ) ) ) ) | 04 CR 28307 Honorable Lawrence W. Terrell, Judge Presiding. |
| Docket No. COURT Opinion Filed | No. 1-09-2472 Appellate Court of Illinois First District, FOURTH Division  April 7, 2011 (Give month, day and year) | |
| JUSTICES | JUSTICE LAVIN delivered the judgment of the court, with opinion. Gallagher, P.J., and Pucinski, J., concurred in the judgment and opinion. | |
| APPEAL from the Circuit Ct. of Cook County. | Lower Court and Trial Judge(s) in form indicated in the margin: The Lawrence W. Terrell, Judge Presiding. | |

1-09-2472

| | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. |
|---|---|
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Attorneys for Defendant-Appellant:<br>Donna Hickstein-Foley<br>Foley & Foley<br>9644 S. Hamilton Ave.<br>Chicago, IL 60643-1631<br>773.881.3800<br>Attorneys for Plaintiff/Appellee:<br>Anita Alvarez, State's Attorney<br>Alan Spellberg, Peter Fischer, ASA's of Counsel<br>Room 309- Daley Center<br>Chicago, IL 60602 |